**UNIFORMED SANITATION MEN ASSOCIATION, INC., et al., Plaintiffs-Appellees,**

v.

**COMMISSIONER OF SANITATION OF the CITY OF NEW YORK et al., Defendants-Appellants.**

**No. 506, Docket 34338.**

United States Court of Appeals, Second Circuit.

Argued Feb. 9, 1970.

Decided April 3, 1970.

Leonard B. Boudin, New York City (Rabinowitz, Boudin & Standard, New York City and Dorian Bowman, New York City, of counsel), for plaintiffs-appellees.

John J. Loflin, Asst. Corporation Counsel (J. Lee Rankin, Corporation Counsel of City of New York, Stanley Buchsbaum and Yvette Harmon, Assts. Corporation Counsel, of counsel), for defendants-appellants.

Before LUMBARD, Chief Judge, and FRIENDLY and FEINBERG, Circuit Judges.

FRIENDLY, Circuit Judge:

This case returns to us after reversal of a previous decision, 383 F.2d 364 (1967), by the Supreme Court, 392 U.S. 280, 88 S.Ct. 1917, 20 L.Ed.2d 1089 (1968), further disciplinary proceedings by the City of New York, and motions in the district court. The pertinent earlier history can be succinctly stated. City regulations required private cartmen of waste materials to purchase tickets for the privilege of using City waste disposal facilities. The individual plaintiffs were charged with failing to collect such tickets at the City's Marine Transfer Station; instead, they allegedly received cash, which they diverted to their own use, thereby defrauding the City of hundreds of thousands of dollars. An investigation of these activities was conducted in part by observation of detectives on September 10 to 15, 1966, and in part by a wiretap of City telephones pursuant to a court order made on September 19, 1966, under § 813–a of the New York Code of Criminal Procedure.

After the remand from the Supreme Court, the individual plaintiffs were reinstated by the Department of Sanitation on August 21, 1968. On the same day they were called to appear at an inquiry before Mathias L. Spiegel, Deputy Administrator of the Environmental Protection Administration, which includes the Department of Sanitation. All were represented by counsel. Before interrogating Lombardo, the first of the employees to be called, the Deputy Administrator said:

> I want to advise you, Mr. Lombardo, that you have all the rights and privileges guaranteed by the Laws of the State of New York and the Constitution of this State and of the United States, including the right to be represented by counsel at this inquiry, the right to remain silent, although you may be subject to disciplinary action by the Department of Sanitation for the failure to answer material and relevant questions relating to the performance of your duties as an employee of the City of New York.
>
> I further advise you that the answers you may give to the questions propounded to you at this proceeding, or any information or evidence which is gained by reason of your answers, may not be used against you in a criminal proceeding except that you may be subject to criminal prosecution for any false answer that you may give under any applicable law, including Section 1121 of the New York City Charter.

Lombardo gave affirmative answers to questions whether he was employed by the City as a sanitation-man and had been continuously employed at the Marine Transfer Station from October 9, 1955, until December 3, 1966. He was then asked whether during that period he had ever observed "private cartmen enter that station without the required official record being made." He declined to answer on the ground of his privilege against self-incrimination and the further ground that the inquiry was "based upon wire tapping in violation of his constitutional rights." Questions whether he ever saw private cartmen dump waste materials without submitting their official ticketbooks, whether he had ever received money for permitting them to dump waste materials at the Station, whether he turned any such money over to anyone on behalf of the Department of Sanitation, and the like, as well as questions relating specifically to events of September 13, 1966, met with the same response. It was stipulated that each of the employees who had been called (except one who had left the hearing because of illness) would follow the same course. They were thereupon suspended.

On August 30 the Commissioner of Sanitation served the plaintiffs with notice pursuant to N.Y. Civil Service Law, McKinney's Consol.Laws. c. 7, § 75, charging them with misconduct in refusing to answer the questions and notifying them of a hearing before a duly authorized Hearing Officer. George S. Leisure,

Jr., a practicing attorney, was designated as such. Evidence was taken and plaintiffs were given another opportunity to answer the questions propounded on August 21 under the same assurances that had been given then; they declined to do so on the grounds previously asserted. The Hearing Officer recommended that the employees be dismissed. To no one's surprise the Commissioner of Sanitation followed the recommendation.

The parties then returned to the district court where plaintiffs moved for summary judgment directing their reinstatement and, if that was denied, for discovery concerning the source of defendants' information. Defendants cross-moved for summary judgment. Judge Tyler granted plaintiffs' and denied defendants' summary judgment motion, thereby mooting plaintiffs' discovery motion. Conceding for the purpose of argument that it would suffice if plaintiffs had been clothed with "use immunity" as distinguished from "transactional immunity"—of which more hereafter—with respect to any answers they might have given in response to the questions, he thought that, under § 619–c and –d of the New York Code of Criminal Procedure, the City lacked authority to grant immunity even of the former type.

## I.

Analysis must begin with the celebrated case of Counselman v. Hitchcock, 142 U.S. 547, 12 S.Ct. 195, 35 L.Ed. 1110 (1892). Counselman, a grain shipper, was being interrogated by a federal grand jury investigating alleged criminal violations of the anti-discrimination provisions of the Interstate Commerce Act. He declined, on the basis of self-incrimination, to answer questions whether he had shipped at rates less than the published tariffs and whether he had received any rebates. After being directed by the court to answer, and having persisted in his refusal, he was adjudicated in contempt, fined $500, and held in custody until he answered the questions. Rev. Stat. § 860 provided in pertinent part that no discovery or "evidence obtained

from a party or witness by means of a judicial proceeding * * * shall be given in evidence, or in any manner used against him or his property or estate, in any court of the United States, in any criminal proceeding, or for the enforcement of any penalty or forfeiture."

After rejecting the Government's contention that the Fifth Amendment privilege was inapplicable to a witness before a grand jury, the Court also overruled the claim that § 860 gave protection adequate to warrant the compulsion of incriminating evidence. While the statute forbade use of the compelled testimony itself in any court of the United States, "[i]t could not, and would not, prevent the use of his testimony to search out other testimony to be used in evidence against him or his property, in a criminal proceeding in such court. It could not prevent the obtaining and the use of witnesses and evidence which should be attributable directly to the testimony he might give under compulsion, and on which he might be convicted, when otherwise, and if he had refused to answer, he could not possibly have been convicted." The protection of Rev.Stat. § 860 was therefore "not co-extensive with the constitutional provision." 142 U.S. at 564–565, 12 S.Ct. at 199.

It would seem that this should—or at least could—have ended the case. However, Mr. Justice Blatchford went on to note that in some states "it has been attempted by legislation to remove the constitutional provision, by declaring that there shall be no future criminal prosecution against the witness, * * *" 142 U.S. at 565, 12 S.Ct. at 199. He then announced that "a review of the subject in adjudged cases will be useful" and devoted twenty pages, 142 U.S. 565–585, 12 S.Ct. 195, to it. This included two federal decisions—a ruling of Chief Justice Marshall in United States v. Burr, 25 F.Cas. 38, 40 (No. 14,692e) (1807), and Boyd v. United States, 116 U.S. 616, 631, 633, 6 S.Ct. 524, 29 L.Ed. 746 (1886)—which had only slight relevance to the issue, and 14 state decisions. Some of the state courts had found statutes like Rev.Stat. §

860 to be sufficient to warrant punishment for refusal to answer, some had found them insufficient, and two had upheld provisions that entirely relieved the witness from prosecution. The Justice then stated, 142 U.S. at 585–586, 12 S.Ct. at 206:

> We are clearly of opinion that no statute which leaves the party or witness subject to prosecution after he answers the criminating questions put to him, can have the effect of supplanting the privilege conferred by the constitution of the United States. Section 860 of the Revised Statutes does not supply a complete protection from all the perils against which the constitutional prohibition was designed to guard, and is not a full substitute for that prohibition. In view of the constitutional provision, a statutory enactment, to be valid, must afford absolute immunity against future prosecution for the offense to which the question relates.

After all this the opinion closed on the more subdued theme earlier enunciated:

> Section 860, moreover, affords no protection against that use of compelled testimony which consists in gaining therefrom a knowledge of the details of a crime, and of sources of information which may supply other means of convicting the witness or party.

Faced with two criticisms of Rev.Stat. § 860, one narrow and the other broad, Congress decided to play it safe. It directed that no person should be excused from testifying before the Interstate Commerce Commission or from obeying its subpoena on the ground of self-incrimination, "[b]ut no person shall be prosecuted or subjected to any penalty or forfeiture for or on account of any transaction, matter or thing" concerning which he may give or produce such evidence. 27 Stat. 443 (1893). This, the Supreme Court held, "fully accomplished" the ob-

jectives of the constitutional provision and warranted punishment for contempt if the witness refused to answer. Brown v. Walker, 161 U.S. 591, 16 S.Ct. 644, 40 L.Ed. 819 (1896). The "transactional immunity" accorded by the 1893 act was repeated in many subsequent statutes, federal and state.

Despite sharp criticism that such broad immunity should not be required and that prohibiting use of the answer or its fruits should be enough,[1] the necessity for "transactional" immunity as a predicate for contempt remained the received learning until Murphy v. Waterfront Comm'n, 378 U.S. 52, 84 S.Ct. 1594, 12 L.Ed.2d 678 (1964). Murphy and others had there been held in contempt by the New Jersey courts for refusing to answer questions at a hearing before the bi-state Waterfront Commission. They had been granted immunity from prosecution by New Jersey or New York, but refused to answer on the ground that they might incriminate themselves under federal law. The case thus illustrated a difficulty with transactional immunity made acute by our federal system. While, by virtue of the Supremacy Clause, a properly worded federal grant of such immunity could bar prosecution by a state, it had been thought that a state grant of such immunity would not bar prosecution by the United States or another state. Nevertheless, prior to *Murphy* the Court had held that a witness given only transactional immunity against the sovereign compelling him to answer was clothed with sufficient protection, United States v. Murdock, 284 U.S. 141, 52 S.Ct. 63, 76 L.Ed. 210 (1931); Feldman v. United States, 322 U.S. 487, 64 S.Ct. 1082, 88 L.Ed. 1408 (1944); Knapp v. Schweitzer, 357 U.S. 371, 78 S.Ct. 1302, 2 L.Ed.2d 1393 (1958), and the New Jersey courts, following these decisions, found the witnesses in contempt. Overruling its previous decisions, the Court held "that the

---

1. See 8 Wigmore, Evidence § 2283 at 522, 524 (McNaughton rev. 1961); McCormick, Evidence § 135 at 285–286 (1954) ("Surely this [Counselman v. Hitchcock] was a wrong turning at a critical point. Perhaps few decisions in history have resulted in freeing more rascals from punishment.")

constitutional privilege against self-incrimination protects a state witness against incrimination under federal as well as state law and a federal witness against incrimination under state as well as federal law." 378 U.S. at 77–78, 84 S.Ct. at 1609. It then went on to "decide what effect this holding has on existing state immunity legislation." After citing *Counselman* and quoting only the three passages that criticized Rev.Stat. § 860 for failing to protect against use of fruits, the Court held "the constitutional rule to be that a state witness may not be compelled to give testimony which may be incriminating under federal law unless the compelled testimony and its fruits cannot be used in any manner by federal officials in connection with a criminal prosecution against him." 378 U.S. at 79, 84 S.Ct. at 1609. This was followed by the statement:

> We conclude, moreover, that in order to implement this constitutional rule and accommodate the interests of the State and Federal Governments in investigating and prosecuting crime, the Federal Government must be prohibited from making any such use of compelled testimony and its fruits.

The judgment ordering the witnesses to answer the questions was therefore affirmed but they were given another opportunity to do so in light of the added protection afforded. 378 U.S. at 80, 84 S.Ct. 1594.[2]

Although the *Murphy* opinion, particularly because of its highly selective quoting of *Counselman,* has been thought to indicate that *Counselman's* broader alternative ground had been repudiated *sub silentio,* even in the context of a contempt proceeding by the sovereign granting the immunity, the Court in Stevens v. Marks, 383 U.S. 234, 244, 249–250, 86 S.Ct. 788, 15 L.Ed.2d 724 (concurring opinion of Mr. Justice Harlan) (1966), indicated the question was an open one. The Supreme Court of New Jersey has held that *Murphy* indeed spelled the death of transactional immunity as a requirement for punishment for contempt, In re Zicarelli, 55 N.J. 249, 261 A.2d 129 (1970), and Title II of the Organized Crime Control Act recently passed by the Senate, 116 Cong.Rec. S481 (daily ed. Jan. 23, 1970), proceeds upon that view. See S.Rep. 91–617, 91st Cong., 1st Sess. 51–56 (1969).

## II.

Putting that issue to one side, we turn to recent Supreme Court opinions dealing directly with the privilege against self-incrimination as applied to government employees. The first is Garrity v. New Jersey, 385 U.S. 493, 87 S.Ct. 616, 17 L. Ed.2d 562 (1967), holding that statements by police officers in an investigation wherein the state attorney general had warned they could refuse to answer on the ground of self-incrimination but in that event would be subject to removal from office, could not be used in a subsequent prosecution. The reasoning was that the threat of removal constituted the kind of compulsion against which the constitutional privilege was directed and that therefore statements made under such compulsion could not be used at the criminal trial. Once the first proposition was accepted, the second followed from the very language of the Fifth Amendment. See 8 Wigmore, Evidence, § 2270 at 417–19 (McNaughton rev. 1961), citing many cases, including Adams v. Maryland, 347 U.S. 179, 181, 74 S.Ct. 442, 98 L.Ed. 608 (1954).

---

2. We disagree with the district court's conclusion that the *Murphy* ruling barring the Federal Government from using testimony or the fruits of testimony compelled under a state immunity statute rested on the Supreme Court's supervisory power. The language both of Justice Goldberg's opinion and of Justice Harlan's concurring opinion, 378 U.S. at 80, 84 S.Ct. 1594, indicates it was rather a rule of constitutional law that when a state compels testimony under a grant of immunity, the United States is prohibited from using the testimony or its fruits, and *per contra* that this degree of prohibition is enough to warrant a state in punishing a refusal to answer.

On the same day the Court decided Spevack v. Klein, 385 U.S. 511, 87 S.Ct. 625, 17 L.Ed.2d 574 (1967), holding that New York could not disbar a lawyer solely for refusing, on the basis of the privilege against self-incrimination, to produce financial records and to testify at a judicial inquiry into "ambulance chasing." For our purposes the important opinion in *Spevack* is that of Mr. Justice Fortas, whose vote was needed to make a majority. This said in pertinent part, 385 U.S. at 519, 87 S.Ct. at 630:

> This Court has never held, for example, that a policeman may not be discharged for refusal in disciplinary proceedings to testify as to his conduct as a police officer. It is quite a different matter if the State seeks [as in *Garrity*] to use the testimony given under this lash in a subsequent criminal proceeding.

It fell to Mr. Justice Fortas to develop these thoughts in speaking for the Court in Gardner v. Broderick, 392 U.S. 273, 88 S.Ct. 1913, 20 L.Ed.2d 1082 (1968), and on the appeal in this case, decided the same day, 392 U.S. 280, 88 S.Ct. 1917, 20 L.Ed.2d 1089 (1968). In both cases the lower courts had upheld the discharge of public employees for refusing to sign waivers of immunity. In both the Court reversed. It pointed out that the waiver at least purported to deprive the employees of protection against use of statements or their fruits; New York was seeking "testimony from their own lips, which, despite the constitutional prohibition, could be used to prosecute them criminally," 392 U.S. at 284, 88 S.Ct. at 1919. However, the Court said in *Gardner*, 392 U.S. at 278, 88 S.Ct. at 1916:

> If appellant, a policeman, had refused to answer questions specifically, directly, and narrowly relating to the performance of his official duties without being required to waive his immunity with respect to the use of his answers or the fruits thereof in a criminal prosecution of himself, Garrity v. State of New Jersey, *supra*, the privilege against self-incrimination would not have been a bar to his dismissal.

In its opinion in this case, the Court reiterated the point as follows, 392 U.S. at 284, 88 S.Ct. at 1920:

> As we stated in Gardner v. Broderick, *supra*, if New York had demanded that petitioners answer questions specifically, directly, and narrowly relating to the performance of their official duties on pain of dismissal from public employment without requiring relinquishment of the benefits of the constitutional privilege, and if they had refused to do so, this case would be entirely different. In such a case, the employee's right to immunity as a result of his compelled testimony would not be at stake. But here the precise and plain impact of the proceedings against petitioners as well as of § 1123 of the New York Charter was to present them with a choice between surrendering their constitutional rights or their jobs. Petitioners as public employees are entitled, like all other persons, to the benefit of the Constitution, including the privilege against self-incrimination. Gardner v. Broderick, *supra*; Garrity v. New Jersey, *supra*. Cf. Murphy v. Waterfront Commission, 378 U.S. 52, at 79, [84 S.Ct. 1594, 1607, at 1609, 12 L.Ed.2d 678] (1964). At the same time, petitioners, being public employees, subject themselves to dismissal if they refuse to account for their performance of their public trust, after proper proceedings, which do not involve an attempt to coerce them to relinquish their constitutional rights.

Still further illumination is cast by the concurring opinions of Mr. Justice Harlan for himself and Mr. Justice Stewart, 392 U.S. at 285,

> Given in combination the decisions in Spevack v. Klein, 385 U.S. 511, 87 S.Ct. 625, 17 L.Ed.2d 574, and Garrity v. New Jersey, 385 U.S. 493, 87 S.Ct. 616, 17 L.Ed.2d 562, I can find no solidly acceptable course for me to take in these cases other than to concur in the judgments rendered by the Court. I do so with a good deal less reluctance than would otherwise have been the

case because, despite the distinctions which are sought to be drawn between these two cases on the one hand, and *Spevack* and *Garrity*, on the other, I find in these opinions a procedural formula whereby, for example, public officials may now be discharged and lawyers disciplined for refusing to divulge to appropriate authority information pertinent to the faithful performance of their offices. I add only that this is a welcome breakthrough in what *Spevack* and *Garrity* might otherwise have been thought to portend.

### III.

■ These extracts make as clear as anything can be that "use immunity" suffices for the discharge of public employees who "refuse to account for their performance of their public trust." So the Supreme Judicial Court of Massachusetts has held in an opinion by the late Justice Whittemore, with which we agree. Silverio v. Municipal Court, 247 N.E.2d 379, cert. denied, 396 U.S. 878, 90 S.Ct. 151, 24 L.Ed.2d 135 (1969). Even if use immunity should ultimately be held insufficient in the *Counselman* situation, which we in no way intimate, there would be sufficient reasons to support a less stringent requirement with respect to immunity where the issue is not whether a witness should be put in jail until he answers but whether a public employee should be dismissed for refusing to give an account of his official conduct. Granted that under *Garrity* the threat of dismissal constitutes compulsion, such a public employee given use immunity is not being required "to be a witness against himself." Although the choice with which he is faced may not be without pain, it is one that would confront an employee of a private company as a matter of course.[3] In a case like this the state is asserting not its inter-

est in the enforcement of the criminal law but its "legitimate interest as employer." Note, Another Look at Unconstitutional Conditions, 117 U.Pa.L.Rev. 144, 168 (1968). To require a public body to continue to keep an officer or employee who refuses to answer pertinent questions concerning his official conduct, although assured of protection against use of his answers or their fruits in any criminal prosecution, would push the constitutional protection beyond its language, its history or any conceivable purpose of the framers of the Bill of Rights.

■ If "use immunity" thus suffices to permit the discharge of a public employee who refuses to answer questions about his conduct on the ground of self-incrimination, we see no reason why there must be a statute conferring it. There was none in *Garrity*, 385 U.S. at 495, 87 S.Ct. 616, 17 L.Ed.2d 562, but the very act of the attorney general in telling the witness that he would be subject to removal if he refused to answer was held to have conferred such immunity. As indicated above, there was nothing novel about this. In Adams v. Maryland, *supra*, 347 U.S. at 181, 74 S.Ct. 442, at 444, 98 L.Ed. 608 (1954), in rejecting a construction that a statute providing that no testimony before a congressional committee "shall be used as evidence in any criminal proceeding against him in any court" was inapplicable where the witness had not objected, Mr. Justice Black said:

> Indeed, a witness does not need any statute to protect him from the use of self-incriminatory testimony he is compelled to give over his objection. The Fifth Amendment takes care of that without a statute.

We recognize that *Adams* and *Garrity* dealt only with immunity conferred in favor of a person who had made disclo-

---

3. It is true that because of the greater formality of disciplinary proceedings with regard to public employees, they face the possibility of prosecution for false statements which private employees giving statements to their employer do not. As

against this *Garrity* gives them an immunity from use of any statements in a criminal prosecution which private employees being interrogated by their employers do not enjoy.

sures, whereas the plaintiffs here have chosen to remain silent. But in light of Mr. Justice Fortas' opinion in *Gardner* this cannot serve as a basis for distinction. Justice Fortas stated in so many words that if a public officer is asked about performance of his official duties and is not required to waive immunity, the privilege is not a bar to his dismissal for refusal to answer. He said nothing about a statutory grant of immunity and the citation of *Garrity* shows why nothing needed to be said. No contrary inference can be drawn from the last sentence in the extract quoted from Justice Fortas' opinion in this case. "After proper proceedings" means proceedings, such as those held here, in which the employee is asked only pertinent questions about the performance of his duties and is duly advised of his options and the consequences of his choice. The proceeding here involved no attempt to coerce relinquishment of constitutional rights, because public employees do not have an absolute constitutional right to refuse to account for their official actions and still keep their jobs; their right, conferred by the Fifth Amendment itself, as construed in *Garrity*, is simply that neither what they say under such compulsion nor its fruits can be used against them in a subsequent prosecution.

■■ We likewise see no force in the claim that for New York City to confer use immunity by a procedure such as was followed here [4] would be inconsistent with the New York Code of Criminal Procedure, and hence need not determine what would be the consequences if it were. The contention is that § 619–c.4 provides that "Immunity shall not be conferred upon any person except in accordance with the provisions of this section," and that the City is not among those listed as "competent authority" to do this. The argument overlooks that this section is addressed only to "immunity" defined in the following terms: "that such person shall not be prosecuted or subjected to any penalty or forfeiture for or on account of any transaction, matter or thing concerning which, in accordance with the order by competent authority, he gave answer or produced evidence, and that no such answer given or evidence produced shall be received against him upon any criminal proceeding." The City does not assert that it can grant immunity of this type, which New York continues to require as a condition to compelling a witness who claims the constitutional privilege to answer under pain of contempt; it asserts rather that use immunity suffices to permit discharge of those who refuse to account for performance of a public trust. The 1967 Legislature which adopted § 619–c must have been aware of § 75 of the Civil Service Law, which provides for disciplinary proceedings against state and city employees, and of the consequences, so recently stated by the Supreme Court in *Garrity*, of telling an employee charged in such a proceeding that he might be removed if he refused to answer a question on the ground of self-incrimination. Moreover, the Court of Appeals has held that when a grand jury violates a witness' state constitutional privilege, use immunity is automatically conferred, People v. Steuding, 6 N.Y.2d 214, 189 N.Y.S.2d 166, 160 N.E.2d 468 (1959); People v. Laino, 10 N.Y.2d 161, 218 N.Y. S.2d 647, 176 N.E.2d 571 (1961), cert. denied, 374 U.S. 104, 83 S.Ct. 1687, 10 L.Ed.2d 1027 (1963). See also People v. LaBello, 24 N.Y.2d 598, 607, 301 N.Y. S.2d 544, 551, 249 N.E.2d 412 (1969), cert. granted, Piccirillo v. New York, 397 U.S. 933, 90 S.Ct. 957, 25 L.Ed.2d 114 (1970). We perceive no reason why New York should not have considered that the same consequences would follow if the plaintiffs here had an-

---

4. By memorandum dated May 12, 1969, Mayor Lindsay advised all agency heads of "procedures to be followed with respect to City employees suspected of incompetency or misconduct," which were outlined in an enclosed memorandum by Corporation Counsel J. Lee Rankin. These paralleled the procedures assuring employees of "use immunity" that were followed here.

swered, after claiming the privilege, under the coercion of threatened loss of employment for refusal—even assuming that New York had a choice. There are good reasons why officers, although not authorized to grant transactional immunity, may give use immunity. In many instances a grant of transactional immunity may be against the interests of the government; it follows that only those in a position to weigh the advantages, if any, against the disadvantages should be authorized to confer it. On the other hand, when use immunity is given to a public employee in accordance with *Gardner*, it can be assumed that the government, as employer, is seeking to benefit from knowledge about the performance of his job. Moreover, use immunity is relatively costless; as explained by Mr. Justice Goldberg in *Murphy*, 378 U.S. at 79, 84 S.Ct. 1594, 12 L.Ed.2d 678, the government, as prosecutor, is in substantially the same position in having the answer but being unable to use it or its fruits as it would have been if the witness had insisted on remaining silent.[5]

### IV.

■■■ We turn finally to plaintiffs' renewed objection on the score of wiretapping which we rejected in the prior appeal, 383 F.2d at 369. Although "the 'law of the case' does not rigidly bind a court to its former decisions, but is only addressed to its good sense," Higgins v. California Prune & Apricot Grower, Inc.,

3 F.2d 896, 898 (2 Cir. 1924), we see no reason to alter the ruling that the City did not violate former § 605 of the Federal Communications Act, see People v. Canard, 257 Cal.App.2d 444, 65 Cal.Rptr. 15 (1967), cert. denied, 393 U.S. 912, 89 S.Ct. 231, 21 L.Ed.2d 198 (1968), or the Fourth Amendment, see Alderman v. United States, 394 U.S. 165, 179 n. 11, 89 S.Ct. 961, 22 L.Ed.2d 176 (1969), by tapping its own telephones in search of evidence against faithless employees. Indeed, so far as the Fourth Amendment is concerned, there is no need to rely on that point. Non-trespassory wiretapping was brought under the Fourth Amendment by Katz v. United States, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967), which Desist v. United States, 394 U.S. 244, 89 S.Ct. 1030, 22 L.Ed.2d 248 (1969), has held applicable only to such wiretaps conducted after December 18, 1967. Adherence to our previous ruling concerning § 605 makes it unnecessary to consider the effect of the Omnibus Crime Control and Safe Streets Act, 82 Stat. 212 (1968), on wiretaps that were illegal under that section, or the City's persuasive contention that the questions propounded at the 1968 hearings were based solely on visual observations by detectives prior to the wiretap.

The judgment granting plaintiffs' motion for summary judgment is reversed and the district court is instructed to enter summary judgment for the defendants.

---

5. We do not regard our conclusion as inconsistent with part 2 of Judge Leventhal's opinion in Ellis v. United States, 416 F.2d 791, 796–798 (D.C.Cir. 1969), which we read as limited to the functioning of judges with respect to witnesses with valid claims of privilege against self-incrimination, and thus have no occasion to consider whether we agree with it.

The Supreme Court opinions discussed in the text show that no inhibitions exist with respect to executive officers demanding that government employees answer pertinent questions or take the consequences of possible removal, with attendant "use immunity" if they choose to answer.