George **KALKINES**

v.

The **UNITED STATES.**

No. 534–71.

United States Court of Claims.

Feb. 16, 1973.

As Amended on Rehearing June 1, 1973.

Arthur Goldstein, Huntington, N.Y., attorney of record, for plaintiff. Goldstein & Hirschfeld, Huntington, N.Y., and David Serko, New York City, of counsel.

Judith A. Yannello, Washington, D. C., with whom was Asst. Atty. Gen. Harlington Wood, Jr., for defendant.

Before COWEN, Chief Judge, DAVIS, SKELTON, NICHOLS, KASHIWA, KUNZIG, and BENNETT, Judges.

ON PLAINTIFF'S MOTION AND DE-FENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT

DAVIS, Judge:

Plaintiff George Kalkines worked for the Bureau of Customs of the Treasury Department from November 1960 until his suspension in June 1968, rising from an initial rating of GS–7 to the position of import specialist, GS–13. His suspension and subsequent discharge came about because of his alleged failure, in violation of the Customs Manual, the Customs Personnel Manual, and the

Treasury Personnel Manual,[1] to answer questions put to him by the Bureau of Customs relating to the performance of his duties. According to management, this failure occurred at four separate interviews, three in New York and one in Washington, each listed as an individual specification of the charge. The agency sustained his removal on this charge, upholding each of the four specifications.[2] The Civil Service Commission affirmed. The validity of this determination is brought before us by the parties' cross-motions for summary judgment, both of which invoke the administrative record on which we rest for our decision.[3]

In November 1967 the Bureau of Customs began an investigation sparked by information saying that plaintiff had accepted a $200 payment from an importer's representative in return for favorable treatment on valuation of a customs entry. The inquiry initially disclosed that plaintiff had had lunch with the representative on November 16th and had made a $400 deposit in his personal bank account on November 17th. He was then visited or summoned by customs agents (acting as investigatory arms of the Bureau) on several occasions, at four of which (November 28, 1967, May 2, 1968, May 8, 1968, all in New York, and June 5, 1968, in Washington) he did not answer, or indicated that he would not answer, certain ques-

tions relating to the $400 deposit, his finances, and some aspects of the performance of his customs duties. At other interviews he did answer the queries then put to him. Plaintiff's defense is that his failure to reply at the four specified times was excusable and justifiable in each instance, and therefore not contrary to the directives cited in footnote 1, *supra.*

The most important fact bearing on the propriety of Mr. Kalkines' conduct at the interviews is that, for all or most of the time, a criminal investigation was being carried on concurrently with the civil inquiry connected with possible disciplinary proceedings against him. The United States Attorney's Office had been informed about the possible bribery before the customs agents' first interview with plaintiff, and it became active in investigating the matter in December 1967; witnesses were subpoenaed to, and did, testify before the grand jury. This criminal inquest continued until well into the spring of 1968, and perhaps even longer. Plaintiff was never indicted, the United States Attorney ultimately declining prosecution, but Mr. Kalkines saw the Damoclean sword poised overhead during the entire period with which we are concerned.

 In recent years the courts have given more precise content to the obligations of a public employee to answer his employer's work-related ques-

1. The Customs Manual provided (§ 27.39 (j)): "Customs employees shall disclose any information in their possession pertaining to customs matters when requested to do so by a customs agent, and shall answer any proper questions put to them by customs agents."

 The Customs Personnel Manual stated (ch. 735, § 3, ¶ 3f): "Every customs employee is required to disclose any information he has concerning customs matters when requested to do so by a customs agent. Every customs employee is required to answer any proper questions posed by a customs agent. Every customs employee, when requested to do so by a customs agent, shall furnish to such agent, or authorize him in writing to obtain, information of the employee's financial af-

fairs which bears a reasonable relationship to customs matters."

 The Treasury Personnel Manual declared (ch. 735, § 0.735–48): "When directed to do so by competent Treasury authority, employees must testify or respond to questions (under oath when required) concerning matters of official interest. See further 31 CFR 1.10."

2. The original notice contained three other charges which were not sustained by the agency and are not before us.

3. There was a full-scale hearing within the Treasury Department (the "agency hearing"), which the record sets forth in question-and-answer form, as well as some additional testimony taken by the Civil Service Commission's Regional Office, of which we have a narrative summary.

tions where, as here, there is a substantial risk that the employee may be subject to prosecution for actions connected with the subject of management's inquiry. It is now settled that the individual cannot be discharged simply because he invokes his Fifth Amendment privilege against self-incrimination in refusing to respond. Gardner v. Broderick, 392 U.S. 273, 88 S.Ct. 1913, 20 L. Ed.2d 1082 (1968); Uniformed Sanitation Men Ass'n v. Commissioner of Sanitation, 392 U.S. 280, 88 S.Ct. 1917, 20 L.Ed.2d 1089 (1968). Conversely, a later prosecution cannot constitutionally use statements (or their fruits) coerced from the employee—in an earlier disciplinary investigation or proceeding—by a threat of removal from office if he fails to answer the question. Garrity v. New Jersey, 385 U.S. 493, 87 S.Ct. 616, 17 L.Ed.2d 562 (1967). But a governmental employer is not wholly barred from insisting that relevant information be given it; the public servant can be removed for not replying if he is adequately informed both that he is subject to discharge for not answering and that his replies (and their fruits) cannot be employed against him in a criminal case. See Gardner v. Broderick, *supra,* 392 U.S. at 278, 88 S.Ct. 1913, 20 L.Ed.2d 1082; Uniformed Sanitation Men Ass'n v. Commissioner of Sanitation, *supra,* 392 U.S. at 283, 284, 285, 88 S.Ct. 1917, 20 L.Ed.2d 1089 [hereafter cited as *Uniformed Sanitation Men I*] Uniformed Sanitation Men Ass'n v. Commissioner of Sanitation, 426 F.2d 619 (C.A.2, 1970), cert. denied, 406 U.S. 961, 92 S. Ct. 2055, 32 L.Ed.2d 349 (1972) [hereafter cited as *Uniformed Sanitation Men II*].

This requirement for a sufficient warning to the employee, before questioning, was foreshadowed by the Supreme Court in *Uniformed Sanitation Men I,* and has been set forth more exactly by the Second Circuit in *Uniformed Sanitation Men II.* The highest court said that public employees "subject themselves to dismissal if they refuse to account for their performance of their public trust, after proper proceedings, which do not involve an attempt to coerce them to relinquish their constitutional rights." 392 U.S. at 285, 88 S.Ct. at 1920. "Proper proceedings" of that type means, according to Chief Judge Friendly in *Uniformed Sanitation Men II,* inquiries, such as were held in that case,[4] "in which the employee is asked only pertinent questions about the performance of his duties *and is duly advised of his options and the consequences of his choice.*" 426 F.2d at 627 (emphasis added). The same opinion said: "To require a public body to continue to keep an officer or employee who refuses to answer pertinent questions concerning his official conduct, *although assured of protection against use of his answers or their fruits in any criminal prosecution,* would push the constitutional protection beyond its language, its history or any conceivable purpose of the framers of the Bill of Rights." 426 F.2d at 626 (emphasis added). We think that the general directives of the various Treasury and Customs manuals (footnote 1, *supra*) should be read with

4. Those employees were advised as follows at the time management put the questions to them (426 F.2d at 621):

"I want to advise you, Mr. ———, that you have all the rights and privileges guaranteed by the Laws of the State of New York and the Constitution of this State and of the United States, including the right to be represented by counsel at this inquiry, the right to remain silent, although you may be subject to disciplinary action by the Department of Sanitation for the failure to answer material and relevant questions relating to the performance of your duties as an employee of the City of New York.

"I further advise you that the answers you may give to the questions propounded to you at this proceeding, or any information or evidence which is gained by reason of your answers, may not be used against you in a criminal proceeding except that you may be subject to criminal prosecution for any false answer that you may give under any applicable law, including Section 1121 of the New York City Charter."

this specific gloss supplied by the *Uniformed Sanitation Men* opinions.

■ The only issue we need address is whether plaintiff was "duly advised of his options and the consequences of his choice" and was adequately "assured of protection against use of his answers or their fruits in any criminal prosecution." For the reasons which follow, we hold that this requirement was not fulfilled on any of the four occasions at which he is charged with failing to respond, that as a consequence he did not transgress the duty-to-reply regulations, and therefore that he was invalidly discharged for not answering the questions put to him.

At the interview of November 28, 1967, it is clear that no advice or warnings as to his constitutional rights was given to Mr. Kalkines, though he was told of the requirement of the Customs Manual that he answer. Despite the fact that the matter had already been presented to the United States Attorney (as the customs agents knew), plaintiff was not told that his answers (or information stemming from them) could not be used against him in a criminal proceeding. So as far as the investigators were concerned, he was left sharply impaled on the dilemma of either answering had thereby subjecting himself to the possiblity of self-incrimination, or of avoiding giving such help to the prosecution at the cost of his livelihood. The record shows conclusively that at this interview Mr. Kalkines was keenly aware of, and troubled by, the possible criminal implications, and that his failure to respond stemmed, at least in very substantial part, from this anxiety. *See also* note 6 *infra*.

■ The next specification is that plaintiff refused to answer pertinent questions on May 2, 1968.[5] By this time, he had retained an attorney, but counsel was not present. Mr. Kalkines declined to answer unless he had the opportunity of consulting with his lawyer. After an exchange on this subject, the customs agent did not attempt to question him further, but called the attorney on the telephone and arranged for a joint meeting on May 8th. The Regional Office of the Civil Service Commission "concluded that there was at the least an implied acquiescence to the [plaintiff's] request for the presence of his attorney as of May 2, 1968, and, in the circumstances, the [plaintiff's] failure to answer questions on that date may not be recognized to have established a substantive basis to support" the specification as to May 2d which, accordingly, the Regional Office held not to be sustained. Without overturning the Regional Office's factual finding on this point, the Board of Appeals and Review ruled that plaintiff was nevertheless guilty of failing to respond on May 2d. The basis for this holding appears to be that an employee's obligation to answer is so absolute that it cannot even be waived by the interrogating agent's agreement to wait until the lawyer is present. This, we hold, was plain error. If, as in this instance, the interrogator acquiesces in a request that questioning be deferred, the employee cannot be held to have violated his duty to account. The directives of the manuals cannot reasonably be interpreted in so absolute, rigid, and insensitive a fashion.[6]

In addition, there is no indication whatever that plaintiff was told on May

---

5. Between November 28, 1967, and May 2, 1968, he had been called for an interview on December 15th. On this occasion he was informed, according to the Civil Service Commission's Regional Office, "of his constitutional rights to remain silent and to have the presence of an attorney for consultation during the questioning, *and that anything he said could be used against him in court proceedings*" (emphasis added). He answered the questions posed, and his conduct at that interview is not charged against him in the present proceedings.

6. We are also very dubious about a related holding of the Board of Appeals and Review with respect to the first interview on November 28th, *supra*. The Regional Office accepted plaintiff's testimony that on that day he was first confronted with a serious allegation of miscon-

2d that any answers could *not* be used against him criminally. At the last meeting on December 15th (*see* note 5 *supra*), the agent had specifically informed Mr. Kalkines that his answers *could* be used against him in a criminal proceeding, and in the absence of an explicit disavowal that advice could be expected to retain its force. Plaintiff justifiably remained under the impression that his replies could lead to his conviction of a criminal offense.

The third day on which plaintiff is accused of not answering was May 8, 1968. At that time he appeared with counsel. There is a dispute in the testimony as to whether the attorney improperly interfered with the questioning by preventing, in effect, the putting of particular questions. In any event, no specific questions were asked or answered, and the agent ultimately directed counsel to withdraw from the room while a statement was taken from Mr. Kalkines. Thereupon both the attorney and plaintiff left the room. Plaintiff was told that he had to answer and that he had no right to have his counsel present but declined to stay or respond. Again, the significant element is that it is indisputable that neither the employee nor the lawyer was ever advised on May 8th that the responses to the questions, and their products, could not be used against plaintiff in a criminal trial or proceeding. In whatever way one interprets the controverted evidence as to the course of that meeting, this much is clear—no such caution was given, expressly or impliedly, by the agents.

On these facts, the only outcome, for the first three of the four specifications (November 28, 1967; May 2, 1968; May 8, 1968), must be that plaintiff cannot be held to have violated his obligation to answer. At those times a criminal investigation was either in the immediate offing or was actively being carried on. At the least, there is no question but that plaintiff thought so, and had no good reason to think otherwise. He obviously obtained a lawyer primarily because he was disturbed at the possibility of a criminal accusation; that danger was uppermost in his mind. It was reasonable for him to fear that any answer he gave to the customs agents might help to bring prosecution nearer; indeed, it was sensible to think that the civil and the criminal investigations were coordinated, so that the former would help the latter. He was never told that under the law his responses to the customs agents could not be used or would not be used as bricks to build him a prison cell. On the contrary, the one time the subject was mentioned by the agents (on December 15th, *see* note 5 *supra*), they said that his replies *could* be used against him. Under the standard of the *Uniformed Sanitation Men* decisions, these three proceedings cannot be called "proper." Plaintiff was not "duly advised of his options and the consequences of his choice." Quite the opposite, he was left to squirm with a

duct on his part (with criminal implications) and as a consequence became nervous and flustered, being unable to continue the interview and just "closed down." He did return the next day and answered detailed and extensive questions, including inquiries as to the $400 deposit on November 17th. On the basis of these facts, the Region found that plaintiff's "first refusal to reply on November 28, 1967 was effectively set aside as basis for the adverse action" and that the specification involving November 28th "is not sustained as substantive cause in support of that action."

Again, without reversing the Regional Office's finding of fact—paraphrased by the Board as: "the Region was persuaded that Mr. Kalkines' refusal to cooperate at the first interview could be attributed to shock and mental stress"— the Board of Appeals and Review reinstated that specification on the ground, apparently, that the duty to respond is so absolute that failure cannot be excused by "shock and mental stress", and even though the questions were answered the next day. This harsh position is very questionable. We have the greatest doubt that a federal employee can be validly discharged if it is determined, first, that his failure to answer queries on one day is due to such a disabling mental or emotional condition and, second, that he did respond to the questions shortly thereafter.

choice he should not have been put to—the possibility of going to jail or of losing his job. *Cf.* Stevens v. Marks, 383 U.S. 234, 86 S.Ct. 788, 15 L.Ed.2d 724 (1966).

The Government suggests that Mr. Kalkines, or at least his lawyer, should have known that his answers (and their fruits) could not be used to his disadvantage, and therefore that the explicit caution mandated by *Uniformed Sanitation Men II* might be omitted. With respect to the plaintiff, a frightened layman, this is certainly an unacceptable position; he could not be expected to know what lawyers and judges were even then arguing about. The case is hardly better for insisting that the attorney should have known, and should have been responsible for alerting his client. Garrity v. New Jersey, *supra*, 385 U.S. 493, 87 S.Ct. 616, 17 L.Ed.2d 562, was not decided until January 16, 1967, and its reach was uncertain for some years. *Gardner* and *Uniformed Sanitation Men I* did not come down until June 10, 1968—after the last failure-to-respond charged against this plaintiff. *Uniformed Sanitation Men II* was not decided until April 3, 1970 (the Supreme Court did not decline review until May 30, 1972). Many knowledgeable people believed that a specific immunity statute was necessary before anybody in the Federal Government could assure criminal immunity to individuals, including employees, being questioned in non-criminal proceedings. Perhaps, we may add, the law on the point is not yet wholly firm. At any rate, even the legendary Mr. Tutt, fictional legal genius of a generation or two ago, would have been hard put to know with any certainty, in the fall of 1967 and the spring of 1968, that this employee would be protected against prosecutorial use of his statements made to the customs agents.

This brings us to the last interview on June 5, 1968. Plaintiff was peremptorily ordered to come to Washington for this meeting with less than a day's notice; he came without his lawyer who was engaged at the time on other urgent legal business and could not leave the New York area. The record contains a transcript of a portion of the interview. An agent opened by informing Mr. Kalkines that he was required to answer questions, and inquired whether he would "answer such questions as they pertain to your employee-employer relationship to the Bureau of Customs and the duties you perform on behalf of the Customs Service." Plaintiff then said that he had "been advised by the customs agents that they are investigating me on an alleged criminal action. I was further advised by them to engage counsel." He denied that he had refused to answer proper questions and went on to say that his attorney had advised him that "since this is a criminal action" the counsel should be present; "all I [plaintiff] ask is that if there is a criminal action pending against me that I have a right to have my counsel present."

The agent replied "that the following interview is administrative in nature, that it is not criminal, that there is no criminal action pending against you and that the purpose of this interview is entirely on an employer-employee basis and that furthermore any answers given to questions put to you in the interview cannot and will not be used against you in any criminal action"; that if the interview were in connection with a criminal action the attorney would most certainly be permitted to be present and to advise; and "this is an administrative interview and do you understand that this interview is administrative and accordingly your attorney will not be permitted to be present during the interview." The agent concluded these observations by asking plaintiff whether he would answer questions in counsel's absence.

■ The defendant urges that this was proper and sufficient advice to Mr. Kalkines that he had immunity against use of his responses. But even the agent's most explicit statement was incomplete since it did not refer to the fruits of the answers (in addition to the answers themselves). Moreover, and

very significantly, the remainder of the colloquy shows that plaintiff was still very concerned about a criminal prosecution and that the agent never properly brought home that he would have immunity with respect to his answers. This portion of the interview is set forth in the footnote.[7]

The essential aspects are four: First, in describing a "conduct" investigation the agent clearly indicated that a criminal investigation or trial was still possible; he contented himself with reiterating that his own concern was "administrative" and he was not pursuing a violation of criminal law, without denying that a criminal proceeding could possibly eventuate. Second, the agent never really responded to plaintiff's query as to whether the criminal investigation had been dropped, and did not tell him that the U. S. Attorney had refused to go forward with prosecution.[8] Third, the agent failed to repeat or even refer to the earlier statement about non-use for criminal purposes of plaintiff's answers in this "administrative" inquiry. Fourth, the plaintiff was obviously, and quite reasonably, left uncertain as to the connection between the questioning he was then being asked to undergo and a potential criminal action. This last element seems to us reinforced by some confused remarks of plaintiff's later on in the exchange—after the agent had commenced to ask specific questions—which seem to express great doubt about the separation between the civil and criminal sides of the investigation.[9] Moreover, at the agency hearing, both the interrogating agent and the plaintiff made it clear in their testimony that plaintiff was fearful on June 5th that the criminal aspect was still inextricably

---

7. "A. To go over what you just said, are you stating that there is no criminal investigation relative to this matter, has this been dropped?

"Q. This interview and the purpose of this interview is purely administrative and is not a criminal action or related to a criminal action as it pertains to you.

"A. I don't understand, you are not answering my question, is there an investigation relative to me, a criminal investigation?

"Q. No, there is a conduct investigation pending against you.

"A. For the record, may I state this is the first time that I have ever been told this. I have been advised for the last 6 months that I am under investigation for a criminal action and further I don't know the difference between a conduct and a criminal action.

"Q. It is possible that if you have acted improper in the conduct of your business that your conduct may have involved conduct which is in violation of some criminal law. I restate that this interview is administrative and is not pursuing the violation of criminal law if one existed and in view of its administrative nature, your attorney will not be present. Please answer will you or will you not answer the questions I am about to put to you?

"A. I can't see the separation in which you call an administrative interview and the allegations that have unjustly been made against me. In my position, as I have stated, I will answer any and all questions regarding my customs duties gladly, cheerfully, openly, but I would like to be afforded the opportunity of having my counsel present."

8. This is clear enough from the transcript of the interview. It is confirmed, moreover, by Mr. Kalkines' explicit testimony at the agency hearing that at no time during that meeting did the agents tell him that criminal proceedings were not pending against him or that all criminal charges had been dropped. The agents did not testify to the contrary.

9. When the agent began to ask about the questioned customs transaction, the plaintiff repeated that he had never refused, and did not then refuse, to answer about his customs duties, that he wished counsel, and that he had previously answered that question. He went on: "The records cannot substantiate that to sit here and to state that there is disassociation between the allegation made against me and that this is merely the ordinary practice of Customs, I don't think is correct. This is directly associated with an allegation against me and there is no disassociation, cannot be considered an administrative action, and again let me reiterate I have and will continue to answer every question relative to my customs duty, all I ask is that I have a right to have my counsel * * *."

linked to the so-called "conduct investigation."

The sum of this June 5th episode is that, by failing to make and maintain a clear and unequivocal declaration of plaintiff's "use" immunity, the customs agents gave the employee very good reason to be apprehensive that he could be walking into the criminal trap if he responded to potentially incriminating questions, and that in that dangerous situation he very much needed his lawyer's help. The record compels this conclusion. Perhaps the agents were not more positive in their statements because there still remained at that time the possibility of prosecution.[10] Whatever the basis for their failure to clear up plaintiff's reasonable doubts, we are convinced the record shows that he was not "duly advised of his options and the consequences of his choice."[11] His failure to respond was excused on this occasion, as on the earlier dates cited in the other specifications. The agency and the Civil Service Commission erred in disregarding this justification and in holding that the duty to respond was absolute and was violated.

The result is that, for this reason,[12] plaintiff's discharge in 1968 was invalid, and he is now entitled to recover his lost pay, less offsets. His motion for summary judgment is granted and the defendant's is denied. The amount of recovery will be determined under Rule 131(c).[13]

---

10. There is a question whether the idea of a criminal proceeding had been entirely dropped by June 5th. The defendant says it had been but admits that formal notification to that effect was not given by the United States Attorney's Office until some months later. In any event, the customs agent who interrogated plaintiff on June 5th conceded at the agency hearing that, if Mr. Kalkines had then made what appeared to the agents to be incriminating responses or had revealed circumstances which were obviously of a criminal nature, a report would probably have been made to the U.S. Attorney. The agent's superior, who was present at the interrogation, testified at the agency hearing to similar effect.

---

11. An example of proper advice is that given in *Uniformed Sanitation Men II*, *see* note 4 *supra*.

12. We do not reach or consider any of plaintiff's other contentions, including the argument that in any event he was entitled to the assistance of a lawyer at the May 8th and June 5th interviews even if properly advised as to his options.

13. Plaintiff is granted 30 days to file, if he desires, an amendment to his petition requesting restoration under Public Law 92–415, 86 Stat. 652 (August 29, 1972) to his position in the Bureau of Customs. *See* General Order No. 3 of 1972 (Dec. 12, 1972), paras. 3(a), 4(b).