MARSH ET AL., APPELLANTS, *v.*
CIVIL SERVICE COMMISSION OF LORAIN, APPELLEE.

(No. 2597 — Decided December 29, 1977.)

*Mr. Dennis E. Minni* and *Mr. Timothy T. Potts,* for appellants.

*Mr. Norman J. Beller,* for appellee.

MAHONEY, P. J.   The appellants, Arthur J. Marsh, Jr., and James Shinsky, appeal from a judgment entered in the Court of Common Pleas of Lorain County affirming the decision of the appellee, Civil Service Commission, upholding the appellants' discharge from the Lorain Fire Department. We reverse.

### Facts

George Hoffman, a captain of the Lorain Fire Department, was on duty with one other firefighter at the No. 1 Station during the evening of November 24, 1976. An epidemic of "blue flu" had smitten the fire department and had reduced the city companies to approximately one-half their normal complement of firefighters. Four false alarms had been received earlier that day. Three were called in by an unidentified woman or women. At approximately 7:16 p.m. the telephone company told Hoffman there was a person reporting a fire at 220 Day Drive on the line. Hoffman heard a male voice on the line. The captain became suspicious after the operator told him

the caller's phone number began with "244," since a number from Day Drive begins with "288." After the caller hung up, the captain requested the operator to determine the telephone number of the person reporting the fire. She reported the caller's number was listed to Marsh.

Hoffman called Marsh's number. Shinsky answered the telephone. He said Marsh was also present. Shinsky was told to stay there with Marsh until the fire chief or the police arrived. James Kallis, the fire chief, returned to the station from a prior false alarm. Kallis called the telephone company to confirm the information previously given to Hoffman and Kallis then called Marsh. Shinsky again answered and was told to report with Marsh to Kallis' office immediately. Shinsky replied that he and Marsh were sick. Kallis repeated his order and stated that he would contact the police unless appellants complied. Shinsky said he was confused. Kallis hung up and immediately contacted the police department.

Several hours later, a police inspector and a sergeant arrived at Marsh's residence. Marsh inquired if the inspector had a warrant. After they were assured that the inspector merely wished to discuss the false alarm, appellants allowed the policemen inside. A young woman was also present. Appellants were told their *Miranda* rights. Marsh refused to talk until he consulted an attorney. Shinsky stated that the false alarm could have come from the house since he and Marsh had left the door open in expectation of a young women's arrival while they went to a drugstore. Shinsky refused to comment further.

The inspector's report was transmitted to Chief Kallis who was determined to speak with the appellants before deciding upon his course of action. The meeting was held when the appellants reported to work after recovering from the "flu." Marsh admitted he was present when Kallis spoke to Shinsky on the telephone. Shinsky stated: "I don't think that you will believe us but we didn't do it." Both refused to discuss the matter further.

Kallis then suspended the appellants from duty in identical letters, which read, in part, as follows:

"I am hereby, suspending you effective immediately from the Lorain Fire Department for Misfeasance in office and violation of Article XIX, Section #28, which states:

"'Officers and members shall not purposely deceive nor evade any law, ordinance, rule, regulation or order, general, special or verbal.'

"According to reports given to me, it is my opinion, you knowingly were involved in reporting a false alarm at 220 Day Drive, on November 24, 1976, at approximately 7:16 p.m."

The rule referred to in the letters is contained in the rules and regulations of the Lorain Fire Department.

The city director of public safety, Richard Koba, subsequently conducted a hearing concerning the suspensions. The hearing resulted in the discharge of the appellants. The letters informing appellants of their discharges are substantially identical to those prepared by Kallis. The Civil Service Commission voted two to one to uphold the discharges.

The dissenting member of the commission stated the true issue was whether the appellants violated Article XIX, Section 28 of the rules and regulations, not whether they had called in false alarms. He reported that the commission believed that the appellants had, "*** willfully failed to meet the demands of their superior officer and in such a manner as to obviously diminish the value of their sworn word to loyalty and duty.***" He felt, however, that the penalty of discharge was too severe under the circumstances.

An appeal was filed in the Court of Common Pleas pursuant to R. C. 124.34. The court affirmed the decision of the Civil Service Commission.

### Assignment of Error

"The court of common pleas for Lorain County, Ohio, erred as a matter of law in upholding the decision of the Civil Service Commission of the City of Lorain, since the decision of the Civil Service Commission was contrary to the weight of the evidence and since such decision deprived the appellants of their privilege against self-incrimination as guaranteed the appellants by the Fifth and Fourteenth Amendments to the United States Constitution."

We agree with the appellants' contention and the consensus of the Civil Service Commission, as reported by the dissenting member, that the true basis of the discharges was the appellants' failure to answer questions concerning the false

alarm in a satisfactory manner. During his testimony in front of the commission, Kallis stated:

"Only you people here can tell it. He wouldn't talk to me. He buttoned up and in buttoning up, the only recourse I had was to suspend him and turn him over to my boss, the Director.

" * * *

"Mr. Hoffman did talk to Mr. Shinsky and Mr. Marsh. I had no other alternative but to suspend them and turn them over to the Safety Director because I could not get their side of it.

" * * *

"No fire fighter condones a false alarm, but being up and above the average person, where they have taken an oath to protect the City and not try and say, I don't know anything about it, and I'm not going to talk about it. See my lawyer.

"I have no other recourse, Mr. Minni. * * *"

"This is the reason I suspended them."

Koba testified in the same vein:

"These people are firemen. These are not ordinary citizens and, to me, it's their duty, their sworn duty to give testimony as to who gave a false alarm to their buddies and jeopardized their lives in a false alarm, particularly under the circumstances that were in evidence at the time, because not only did they jeopardize their lives, their buddies' lives, and their equipment, I think it was their sworn duty to give the testimony, and I have not heard any testimony from either of them."

The question remains whether appellants were discharged for exercising their privilege not to incriminate themselves. The record permits no other finding than that fire department officials contemplated criminal prosecutions of those responsible for reporting the false alarm. Captain Hoffman instructed the appellants to await the arrival of either Chief Kallis or the police. Chief Kallis immediately contacted the police after speaking to Shinsky, and the police inspector informed the appellants he was investigating the false alarm. The inspector informed the appellants of their *Miranda* rights which must have been interpreted by them as foreshadowing a possible criminal accusation. Reporting a false alarm is, of course, prohibited. See, *e.g.,* R. C. 2917.21(B); 2917.31(A)(1); 2917.32(A)(1) and (2).

The privilege against self-incrimination must be given a liberal construction. *Miranda* v. *Arizona* (1966), 384 U. S. 436. The privilege is not bound by the form of the proceeding, but exists whenever the individual is sought to be compelled to incriminate himself. *McCarthy* v. *Arndstein* (1924), 266 U. S. 34, 40; *Maness* v. *Meyers* (1975), 419 U. S. 449, 464. The assertion of the privilege cannot be burdened with any sanction making the assertion costly to the individual. *Malloy* v. *Hogan* (1964), 378 U. S. 1; *Griffin* v. *California* (1965), 380 U. S. 609. The rule disposing of this appeal is, although an individual can be compelled to give testimony in a noncriminal proceeding, *Garner* v. *United States* (1976), 424 U. S. 648, 655, immunity must be given from subsequent prosecution based upon incriminating statements made during the proceeding. *Baxter* v. *Palmigiano* (1976), 425 U. S. 308, 316.

The interaction of the privilege against self-incrimination with the right of the government to oversee the official activities of its employees has been the subject of several decisions of the United States Supreme Court. In *Garrity* v. *New Jersey* (1967), 385 U. S. 493, police officers were questioned concerning the alleged fixing of traffic tickets and were told they could be discharged unless they answered. The officers gave statements which were subsequently used against them in a criminal proceeding. Indicating that the statements were coerced by the threat of discharge and could not be used in criminal prosecutions, the court reversed the convictions and declared, at page 497, as follows:

"The choice given petitioners was either to forfeit their jobs or to incriminate themselves. The option to lose their means of livelihood or to pay the penalty of self-incrimination is the antithesis of free choice to speak out or to remain silent. * * *"

In a companion case, *Spevack* v. *Klein* (1967), 385 U. S. 511, the plurality opinion held that an attorney could not be disbarred for asserting the privilege against a subpoena demanding certain financial records. In a concurring opinion, Mr. Justice Fortas distinguished the case before the court from the situation wherein a public employee "* * *is asked questions specifically, directly, and narrowly relating to the performance of his official duties as distinguished from his

beliefs or other matters that are not within the scope of the specific duties which he undertook faithfully to perform as part of his employment by the State.***" *Id.,* at 519.

The court returned to this subject in two cases decided the next year. In *Gardner* v. *Broderick* (1968), 392 U. S. 273, the issue was "*** whether a policeman who refuses to waive the protections which the privilege [against self-incrimination] gives him may be dismissed from office because of the refusal." *Id.,* at 276. This question was answered in the negative. The court, however, at page 278, went on and stated:

"***If appellant, a policeman, had refused to answer questions specifically, directly, and narrowly relating to the performance of his official duties, without being required to waive his immunity with respect to the use of his answers or the fruits thereof in a criminal prosecution of himself, *** the privilege against self-incrimination would not have been a bar to his dismissal."

The court again condemned the practice of confronting the individual with the Hobson's choice of possible loss of employment or possible criminal conviction in *Uniformed Sanitation Men Assn., Inc.,* v. *Commissioner of Sanitation* (1968), 392 U. S. 280. There, public employees were unlawfully discharged for refusing to waive their privilege against self-incrimination in administrative and grand jury proceedings. The privilege was not, however, held to be a shield behind which public employees could refuse to answer inquiries addressed to job performance. "***[P]ublic employees*** subject themselves to dismissal if they refuse to account for their performance of their public trust, after proper proceedings, which do not involve an attempt to coerce them to relinquish their constitutional rights." *Id.,* at 285. This was borne out in *Uniformed Sanitation Men Assn., Inc.,* v. *Commissioner of Sanitation* (C. A. 2, 1970), 426 F. 2d 619, certiorari denied (1972), 406 U. S. 961. The public employees were granted "use" immunity from prosecution but again refused to answer questions concerning their official duties. Their discharges were upheld. "Use" immunity from prosecution legitimizes the sanction of discharge for failure to account for the employee's job performance. See *Lefkowitz* v. *Turley* (1973), 414 U. S. 70.

The remaining inquiry concerns the duty placed upon public authorities when seeking to obtain this accounting. We adopt the following conclusion:

"***[A] public employer may discharge an employee for refusal to answer where the employer both asks specific questions relating to the employee's official duties and advises the employee of the consequences of his choice, *i.e.*, that failure to answer will result in dismissal but that answers he gives and fruits thereof cannot be used against him in criminal proceedings.***" *Confederation of Police* v. *Conlisk* (C. A. 7, 1973), 489 F. 2d 891, 894, certiorari denied (1974), 416 U. S. 956; see *Kalkines* v. *United States* (Ct. Cl., 1973), 473 F. 2d 1391.

This practice will result in, "***a rational accommodation between the imperatives of the privilege and the legitimate demands of government to compel citizens to testify.***" *Kastigar* v. *United States* (1972), 406 U. S. 441, 446. It keeps the privilege against self-incrimination intact and preserves the state's right to ensure the proper discharge of the great responsibility bestowed upon its servants. Since the "use" immunity from prosecution derives from the Fifth and Fourteenth Amendments, it is unnecessary that the investigating body be empowered by state law to grant use immunity. *Confederation of Police* v. *Conlisk, supra,* 489 F. 2d, at 895, fn. 4.

The record does not disclose the precise questions propounded to the appellants. We do hold, however, that questions specifically, narrowly, and directly relating to a firefighter's knowledge of a false alarm report concern the performance of the firefighter's official duties. The nature of the firefighter's profession and the terrible risks imposed upon the public by false alarms compel this conclusion. Questions of this nature would be covered by Article XIX, Section 28 of the Lorain Fire Department rules and regulations. The appellants were not told that any statements they made could not be used against them in a criminal prosecution. They were given *Miranda* warnings by the police inspector and had the right to remain silent thereafter without being penalized for that silence.

Since the appellants were discharged for asserting their privilege against self-incrimination, the action of the Civil

Service Commission and the Court of Common Pleas' affirmance of that action must be reversed. Reversal does not, however, mean the city is required to reinstate the appellants. The fire department officials may now conduct an investigation under the guidelines set forth above. If the appellants refuse to answer, after being informed of their "use" immunity, and that refusal to answer could result in discharge, then they face sanctions, including discharge, subject to the usual appellate review. See *Uniformed Sanitation Men Assn., Inc.,* v. *Commissioner of Sanitation, supra* (426 F. 2d 619). We add that the mere fact of speaking would not, of course, shield the appellants from appropriate penalties other than a criminal prosecution based upon their statements.

When a public employer seeks to obtain an accounting of its employees' performance of their official duties through the threat of loss of employment, the employee may properly assert his privilege against self-incrimination. If the public employee refuses to answer questions directly related to the performance of his official duties after being informed of his "use" immunity, he may be discharged. The public employee may not be discharged for asserting his privilege against self-incrimination. The appellants were discharged for asserting their privilege against self-incrimination; consequently, the assignment of error is well taken and the judgment is reversed.

*Judgment reversed.*

VICTOR and BELL, JJ., concur.