NOTE:  This disposition is nonprecedential.

# United States Court of Appeals for the Federal Circuit

---

**ANDRE WATSON,**
*Petitioner*

**v.**

**DEPARTMENT OF THE TREASURY,**
*Respondent*

---

2023-2435

---

Petition for review of the Merit Systems Protection Board in No. CH-0752-20-0450-I-2.

---

Decided:  November 22, 2024

---

ANDRE WATSON, Martinez, GA, pro se.

LIRIDONA SINANI, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, DC, for respondent.  Also represented by REGINALD THOMAS BLADES, JR., BRIAN M. BOYNTON, PATRICIA M. MCCARTHY.

---

Before DYK, CLEVENGER, and HUGHES, *Circuit Judges*.

PER CURIAM

Andre Watson ("Watson") seeks review of the final decision of the Merit Systems Protection Board ("Board"), which sustained the decision of the United States Department of the Treasury ("agency") to remove him from his position as Police Officer with the agency's United States Mint facility at Ft. Knox, Kentucky. *Watson v. Dep't of the Treasury*, No. CH-0752-20-0450-I-2 (M.S.P.B. Aug. 15, 2023) ("*Final Order*"). For the reasons set forth below, we affirm the Board's final decision.

## BACKGROUND

This case involves a scheme in which a private investigator was hired to gather information on the personal lives of two U.S. Mint officials and an investigation by the agency's Office of Inspector General ("OIG") of the scheme. Watson was charged with participating in the scheme and with making false statements to the OIG during its investigation. Effective June 8, 2020, Watson was removed from his position based on charges of Conduct Unbecoming a Federal Officer and Lack of Candor in an Official Investigation.

## A

Watson began his employment with the agency's Ft. Knox facility in 2017. During the summer and fall of 2019, when he was a Sergeant, Watson unsuccessfully applied for promotion to Lieutenant.[1] The application process involved a written test and an oral interview. Inspector Kathi Posey ("Posey"), the second in command at the Ft. Knox facility, was a member of the promotion panel. Watson had previously named Posey as a responsible management official in

---

[1] After his unsuccessful promotion attempt, Watson voluntarily accepted appointment to the lower ranked position of Police Officer.

his Equal Employment Opportunity ("EEO") complaints alleging agency discrimination against him based on his race (Black). Watson questioned the accuracy of his test results because they were lower than what he had achieved on previous practice tests. He attributed his low test scores to Posey and thought she should have recused herself from his interview. Watson mentioned his concerns to Sergeant Jeffrey Fay ("Fay"), a fellow officer who also failed the promotion examination, saying he was considering hiring someone to look into the integrity of the promotion process.

During the same time period, fellow Police Officer Christine Ferguson ("Ferguson") at the Ft. Knox facility approached Watson and told him that she was considering hiring a private investigator to surveil the personal relationship of Posey and Lieutenant Audrey Boykin ("Boykin"). Ferguson suspected a close personal relationship between Posey and Boykin and believed that Posey thus favored Boykin concerning workplace disputes between Ferguson and Boykin. Watson mentioned Ferguson's plan to Fay, and both laughed at her idea of hiring an investigator.

A few months later, on December 10, 2019, Watson, Fay, and Ferguson were all working in the same room at the facility's Police Command Center ("PCC"). When Ferguson spoke with Watson, she again told Watson of her plan. Watson asked, "How much is this going to cost you?" When Ferguson replied that the investigation would cost her $300, Watson asked why she would want to spend so much money just to establish whether the two individuals were having a relationship outside of work. Later that working session, Ferguson showed Fay a text message on her phone indicating her intent to hire an investigator. At 2:42 p.m. on the same day, Watson sent a text message to Fay stating: "The investigator has been hired. If you want to help with this and make it a three way split, then you'll owe $100." Fay immediately responded, sending a photograph of Peter Falk, the lead actor in the television

detective show Columbo, and writing: "The only investigator I will agree to is Columbo! I will get back to you, sir! I was just informed Columbo died in 2011[.]"

On either Thursday, December 12 or Friday, December 13, Fay went to Posey's office and reported to her that Watson and Ferguson had hired an investigator to follow her off duty. Fay told Posey that he was 100% certain that both Watson and Ferguson were involved. On December 16, Posey sent an email to her immediate headquarters supervisor that an investigator had been hired to follow her off duty, expressing alarm for her personal safety and wellbeing as well as that of her family. Posey also reported the matter to Field Chief Lee Booth ("Booth"). Fay reported his beliefs to Booth, and in doing so, he referred to the message that Ferguson showed him in the PCC and the text message that he received from Watson, though Fay did not show Booth Watson's text message.[2]

On December 18, Booth summoned Ferguson to his office. She was accompanied by Police Officer Jimmy Shirley ("Shirley"), the President of the local union. While Ferguson and Shirley were waiting for Booth to appear, Shirley asked Ferguson if she knew about the scheme and if she was involved, and she replied "yes" to both questions. Shirley then asked her if Watson was involved, and she responded "no." When Booth entered the room and

---

[2] Fay provided the OIG with the initial part of the text message from Watson to him, but according to Fay, he did not include his response messages because he had deleted the full text thread of his conversation with Watson as part of his regular practice of deleting text messages, and when he used iCloud to retrieve the text messages, only Watson's initial message was retrievable. The full text message thread was later supplied to the agency by Watson as part of his response to the agency's removal proposal.

questioned Ferguson, he only asked her whether she was involved in hiring a private investigator, and when she responded "yes," he relieved her of duty. As Ferguson was being escorted off the property by Shirley, they overheard a radio transmission stating that Watson was summoned to Booth's office, and Ferguson asked "why are they calling, calling Andre? He has nothing to do with it, with this." When Watson entered Booth's office, Booth asked Watson, who was accompanied by Shirley, whether he was involved in the scheme, to which Watson answered "no." Nevertheless, Booth relieved Watson of duty based on the information received from Fay.

At evening time on the same day, Watson called Ferguson on the phone, and Watson secretly recorded the call.[3] The call began:

Ferguson: Hello?

Watson: Hey, Christine, it's Andre.

Ferguson: Hey, Andre.

Watson: Listen. First and foremost, don't talk to anybody without Jimmy. That's number one.

Ferguson: Yes. Well, I'm going to hire a lawyer. And I talked to the investigator, I'm like, I don't know how the hell they found out. Because I can tell you right now, you and I never spoke in front of anybody.

Watson: No.

---

[3] Watson provided his secretly recorded telephone conversation to the agency as part of his response to the notice of proposed removal.

> Ferguson: Anybody. They must've been – either tapped our emails or my emails, or there's a tap in that control room.
>
> Watson: Don't know, but –
>
> Ferguson: I think there's some – I think it's going to come out that they have – that there's a misconduct on their end too.
>
> Watson: Well, listen, I'm not even worried about it because number one, okay, they don't have anything. . . .

During the call, the parties discussed what evidence management might have against them. Watson did not tell Ferguson about his December 10 text message to Fay. Ferguson, however, reminded Watson that she had sent an email to him about hiring a private investigator. The parties also discussed their interviews with Booth:

> Ferguson: I told him that I did it.
>
> Watson: You told them that you did it?
>
> Ferguson: Yeah. They asked me if I hired an investigator, and I said yes. And they asked me if you knew about it, and I said, no, not until after the fact. I did it on my own. I need to let you know what I said.
>
> Watson: Okay. Well, I respect that.
>
> Ferguson: They really, – they really fricking – I mean, I just – first of all, I hate lying.
>
> Watson: Right.

When Ferguson tried to apologize to Watson, saying: "Well, Andre, I'm – you know what, I apol- – I am so sorry I got you—," Watson replied: 'No, no, no, no, no. Stop. . . . Nobody's mixed up[.]"

Following Watson's call to Ferguson, Watson called Shirley on the telephone. Watson asked Shirley why he was called into Booth's office if Ferguson had already told him that Watson had nothing to do with the scheme. Shirley corrected Watson by informing him that Ferguson had said nothing to Booth about Watson's involvement in the scheme. Shirley then called Ferguson on the telephone and told her that she had lied to Watson when she told him that she had exonerated him in front of Booth.

The matter was referred to the OIG, which interviewed Ferguson, Fay, and Watson on January 6 and 7, 2020. Prior to Watson's OIG hearing, Shirley asked Watson if there was anything Shirley should know, and Watson replied "no." After the OIG hearing, when Shirley told Watson that the investigators had a text message from Watson to Fay, Watson showed Shirley the entire text message thread. Shirley said that he was surprised that Watson had not told him before the OIG interview about the text message, given he was Watson's representative and had asked before the session whether there was anything he should know from Watson.

Before their OIG testimony, Ferguson and Watson were given and signed a "*Kalkines* warning."[4]

Based on sworn testimony from Ferguson and Fay that Watson was aware of and participated in hiring and paying the private investigator, and notwithstanding Watson's

---

[4] A *Kalkine*s warning is issued pursuant to *Kalkines v. United States*, 473 F.2d 1391 (Ct. Cl. 1973), and advises a witness of the duty to disclose information in the person's possession and the consequence of disciplinary action up to, and including, dismissal, for failure to do so. *See id.* at 1393. The warning also provides the witness with immunity from criminal prosecution for statements made or any information obtained as a result of statements. *See id.*

sworn denial that he had participated in hiring the private investigator, the OIG concluded that Watson was involved in the scheme. The proposing and deciding officials at the agency relied on the full record of the agency and the OIG investigations—including the complete text message chain from Watson to Fay and the secretly recorded telephone call—to conclude that the evidence provided by Ferguson and Fay showed Watson's involvement in the scheme and that his involvement warranted his removal from service.

## B

Watson appealed the removal action to the Board. His appeal challenged the agency's removal action and alleged violation of his Fifth Amendment due process rights based on the agency's failure to give him a *Miranda* warning during its interviews with him. He also raised affirmative defenses that his removal was based on his race and was motivated by agency retaliation for his previously filed EEO complaint activity. His case was assigned to an Administrative Judge ("AJ"), who conducted a two-day Zoom hearing during which the AJ heard live testimony from several witnesses.

During the hearing, Ferguson testified that it was her idea to hire the private investigator, and that she paid $300 and received some results from the investigator's surveillance. She testified that Watson agreed to participate in the plan to hire the private investigator and that Watson paid her $150 at the Ft. Knox facility. She acknowledged that she had been untruthful to Watson and to Shirley when she initially informally claimed that Watson was not involved in the scheme, stating that she "told a white lie because I was trying to protect him" because she knew Watson had been disciplined previously for misconduct. She testified that after being informed by Shirley that she would be under oath when testifying before the OIG and could lose her job if she were untruthful to the OIG, she

told the truth when testifying to the OIG that Watson was involved in the scheme.

Fay testified that he and Watson had discussed Ferguson's plan to hire a private investigator, that he had seen Watson and Ferguson whispering to each other in the PCC, and that Watson sent him the text message confirming the hiring of the investigator and Watson's involvement and asking him to join the scheme and share its cost. Fay admitted that he and Watson had a joking relationship in previous text messages between them and that his text response that he would participate only if Columbo was hired was his joking way of saying he wanted no part of the scheme. Fay also testified that he did not treat Watson's text message offer as a joke, as proved by the fact that Watson's text message prompted him to disclose the scheme to his superiors.

Watson testified that he had been aware of Ferguson's plan, which he treated as a joke. He however adamantly denied that he participated in the plan by agreement to it and by paying any money to the investigator. Watson testified that his text message to Fay was just a joke, as evidenced by Fay's responses.

In her decision following the hearing, the AJ recognized that the varying versions of who was involved in execution of the scheme required credibility determinations regarding the three key witnesses. *Watson v. Dep't of the Treasury*, No. CH-0752-20-0450-I-2, at 7 (M.S.P.B. Sept. 9, 2021) ("*Initial Decision*"). The AJ found Fay's testimony not credible for several reasons, including Fay's difficulty recalling specific facts and dates. *Id.* at 8. The AJ doubted Fay's testimony that he only was able to retrieve the first part of the December 10 text message and faulted Fay for not having alerted Booth to his lighthearted response to the first part of the text message. *Id.* at 8-9. The AJ concluded that Fay's testimony was not credible because the full text message thread possibly implicated Fay in the

scheme, and, thus, Fay had a motive to avoid any appearance that he had anything to do with the scheme. *Id.* at 9. The AJ found Fay's demeanor at the hearing "uncomfortable" when relating his version of Watson's involvement in the scheme. *Id.* at 11.

The AJ found Ferguson's testimony not credible "in great part because, at various times, she has both denied and affirmed the appellant's involvement in her plan." *Id.* at 12. The AJ found that Ferguson had a motive to spread culpability for her plan to Watson because she knew that Watson was under investigation as a possible accomplice, rejecting as implausible Ferguson's claim that she told "white lies" to Watson and Shirley just to protect Watson, but that she told the truth about Watson's involvement to the OIG because she could lose her job if she was not truthful to the OIG. *Id.* at 14-15. In addition, the AJ noted that Ferguson's face turned bright red as she tried to justify telling two versions of Watson's involvement, indicating to the AJ that Ferguson was uncomfortable with her testimony given under oath at the hearing. *Id.* at 14.

Regarding Watson's testimony at the hearing, the AJ found that his demeanor was "calm and professional." *Id.* at 16. The AJ credited Watson for having consistently and steadfastly denied involvement in hiring and paying the private investigator throughout the agency's investigations and the hearing. *Id.* at 16. Contrary to the assessment of Ferguson's credibility, as to Watson the AJ concluded that "[t]here is no indication that [Watson] ha[d] previously lied or ha[d] a propensity not to tell the truth." *Id.* at 16.

The AJ concluded that Watson "is more truthful than the agency's two principal witnesses[,]" and, therefore, she credited Watson's testimony over that of the other two witnesses. *Id.* at 16-17. In relying on Watson's version of the facts, the AJ agreed with Watson's testimony that his December 10 text message to Fay was entirely a joke and thus not relevant to the question of Watson's credibility. The AJ

also found no basis for doubting Watson's credibility based on his telephone call to Ferguson the evening of the day when both of them had given statements to Booth.

Upon rejecting the testimony of the agency's two principal witnesses and crediting Watson's testimony, the AJ concluded that the "the agency failed to prove by preponderant evidence that the appellant was involved" in the scheme. *Id.* at 16-17. Thus, the agency failed to sustain its charge of Conduct Unbecoming a Federal Officer. *Id.* at 17. Because the agency's case on the charge of Lack of Candor in an Official Investigation depended on the same evidence as the other charge, the AJ likewise found that the agency failed to sustain that charge. *Id.* at 17-18.

As to Watson's other arguments, the AJ rejected Watson's argument that the agency violated his due process rights by failing to give him a *Miranda* warning. *Id.*at 18. Because the OIG session was not a custodial interrogation, the AJ found the agency was not required to give Watson a *Miranda* warning. *Id.* at 19. The AJ also noted that Watson was given a *Kalkines* warning before his OIG testimony, which effectively granted him immunity from his statements being used against him in a criminal prosecution. *Id.* at 18-19. The AJ also found that Watson failed on the facts to sustain his two affirmative defenses. *Id.* at 19-20.

The AJ ordered the agency in the interim to cancel Watson's removal and to restore him to duty with appropriate back pay and benefits.

## C

The agency filed a petition with the Board challenging the AJ's credibility findings. Watson, represented by counsel, filed a response that did not address the merits of the agency's petition but instead moved to dismiss the petition on the grounds of the agency's failure to comply with the interim relief obligations ordered by the AJ. The Board's decision first rejected Watson's motion to dismiss, finding

agency compliance notwithstanding the agency's failure to include with its petition a certification that it had satisfied its interim obligations. *Final Order* at ¶ 9. The Board's decision then turned to the merits of the agency's petition.

The Board recognized that the AJ's decision turned on credibility findings and acknowledged that the AJ made demeanor-based credibility findings. *Id.* at ¶ 11. The Board noted it normally defers to demeanor-based credibility findings of an AJ and is authorized to overturn such findings only if the record as a whole provides sufficiently sound reasons to do so. *Id.* at ¶ 11 (citing *Haebe v. Dep't of Justice*, 288 F.3d 1288, 1301 (Fed. Cir. 2002)). On review of the record, the Board found sound reasons to overturn the AJ's credibility determinations.

With regard to Watson, the Board pointed to evidence casting doubt on Watson's credibility, which the AJ had not considered in finding Watson's testimony entirely credible. In particular, the Board noted that Watson testified under oath to the OIG that he did not know why Ferguson would want to hire an investigator. *Final Order* at ¶ 12. The Board also pointed to the OIG's question to Watson whether he knew of any phone calls or text messages indicating that anyone else knew about Officer Ferguson's plan, and Watson's denial of any such knowledge. *Id.* at ¶ 12. Because the record showed that Watson knew the reason why Officer Ferguson hired the investigator and knew from his telephone calls and text message that others knew about the scheme, the Board faulted the AJ's credibility determinations for failure to take account of the grounds for doubting Watson's credibility. *Id.* at ¶¶ 13-15.

The Board also faulted the AJ's assessment of Ferguson's credibility. The Board noted that the AJ's determination was largely based on the fact that Ferguson told two versions of Watson's involvement, first lying to Shirley and Watson that she had exonerated Watson and then testifying under oath before the AJ that Watson was involved in

the scheme. *Id.* at ¶ 16. Ferguson's claim that she had lied initially to protect Watson but told the truth under oath was deemed implausible and thus not credible by the AJ. The Board found the AJ's finding insufficient, stating that "[i]t is entirely plausible that Officer [Ferguson] would initially attempt to cover up the appellant's involvement in her plan during informal discussions but admit the truth when faced with an official OIG interview or hearing testimony under oath." *Id.* at ¶ 17. The Board also faulted the AJ's credibility assessment of Ferguson when the AJ found without explanation or citation to any evidence that Ferguson had a motive to spread the culpability for her plan to Watson. *Id.* at ¶ 18.

Finally, the Board determined that some of the reasons cited by the AJ in assessing Fay's testimony as not credible were not well reasoned, citing Fay's inability to recall specific timing of events as usual given the passage of time between events and the hearing and thus not a sufficient ground for undermining credibility. *Id.* at ¶¶ 19-20.

Given the AJ's failure to consider the record-based grounds for doubting the credibility of Watson and aspects of error in assessing the credibility of Ferguson and Fay, the Board determined that it had sufficiently sound reasons to reject the credibility determinations made by the AJ. *Id.* at ¶ 11. Having found sufficiently sound reasons to reject the demeanor-based credibility determinations by the AJ, the Board is empowered to make its own credibility assessments. Upon review of the full record, the Board made its own determination regarding the credibility of the witnesses, declining to credit Watson's testimony, and accepting the testimony of the two agency witnesses, thus finding that "the agency's witnesses' version of events is more likely than the appellant's version of events." *Id.* at ¶ 22. The Board sustained the agency's removal action and affirmed the AJ's findings that Watson failed to prove his affirmative defenses of discrimination and retaliation and his allegation of violation of his due process rights.

Watson timely petitioned this court for review of the Board's final decision. We have jurisdiction under 28 U.S.C. § 1295(a).

## DISCUSSION

Our review of a final Board decision is governed by 5 U.S.C. § 7703(c): we set aside findings or conclusions of the Board only if such findings or conclusions are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; obtained without procedures required by law, rule or regulation having been followed; or unsupported by substantial evidence." Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 217 (1938). The Board accepts demeanor-based credibility findings by an AJ, unless sufficiently sound reasons exist in the record to reject such determinations. *See Haebe*, 288 F.3d at 1301. The question of whether a Board decision states sufficiently sound reasons to reject an AJ's demeanor-based credibility determinations is reviewed for substantial evidence. *Id.*

Watson appears before this court *pro se*. His informal brief challenges the Board's final decision by arguing generally that the AJ correctly assessed the credibility of the relevant witnesses. He does not address the question of whether the Board stated sufficient reasons to reject the AJ's credibility determinations. Second, he argues that the Board failed to consider that "the [a]gency, when deciding to terminate me, utilized information obtained after the close of the investigation to formulate their decision." Appellant's Informal Br. at 2. Third, Watson faults the Board for failure properly to apply *Giglio v. United States*, 405 U.S. 150 (1972) to his case. Fourth, he argues that the Board erred "because of several due process violations,"

citing only the agency's failure to give him a *Miranda* warning."[5] *See* Appellant's Informal Br. at 2.

### A

When a case is decided by an AJ, the AJ's decision is "an initial (or recommended) decision." *Connolly v. U.S. Dep't of Justice*, 766 F.2d 507, 512 (Fed. Cir. 1985) (citing 5 C.F.R. § 1201.111). If an initial AJ decision is appealed to the Board, as in this case, the Board assumes plenary authority over the case and may affirm, reverse, remand, modify, or vacate the decision of the AJ in whole or in part. *Id.* The Board is free to substitute its judgment for that of the AJ, even as to credibility determinations that are not based on observations of the demeanor of a testifying witness. *Haebe*, 288 F.3d at 1302. But where credibility determinations are demeanor-based, as in this case, the Board must find sufficiently sound record-based reasons to reject an AJ's demeanor-based credibility determinations before the Board may make its own credibility determinations. *Id.* at 1301. Sufficiently sound reasons include circumstances when an AJ's findings are incomplete, inconsistent with the weight of the evidence, or do not reflect the record as a whole. *Faucher v. Dep't of the Air Force*, 96 M.S.P.R. 203 ¶ 8 (2004); *Wallace v. Dep't of Com.*, 106 M.S.P.R. 23 ¶¶ 14-16 (2007).

---

[5] Although Watson's informal brief refers to his affirmative defense of race discrimination, that issue is not before us. In his Federal Rule 15(c) Statement Concerning Discrimination, Watson certified that he wishes to abandon his discrimination claim, "and only pursue civil service claims in the Federal Circuit." Fed. Cir. R. 15(c) Statement Concerning Discrimination at 3, *Watson v. Dep't of the Treasury*, No. 2023-2435 (Fed. Cir. Nov. 6, 2023), ECF No. 6.

By arguing that the AJ's credibility determinations were correct, we treat Watson as arguing that the Board erred in substituting its own credibility determinations for those of the AJ, thus raising the question of whether the Board had sufficiently sound reasons, supported by substantial evidence, to reject the AJ's credibility determinations and exercise its plenary authority to credit the testimony of the two agency witnesses and discredit Watson's testimony. *See Haebe*, 288 F.3d at 1301.

Substantial evidence supports the Board's determination of sound reason to reject the AJ's credibility determinations. Most significantly, in giving Watson full credibility, the AJ overlooked that the record demonstrated inconsistencies between Watson's OIG testimony and record evidence. During his OIG testimony, Watson testified that he did not ask anybody else about the scheme and that he did not send any text messages to or have phone calls with anyone about the scheme. However, Watson's own testimony in front of the AJ acknowledged that he sent Fay a text message and called Ferguson about the scheme. *Initial Decision* at 5. Watson also testified during his OIG testimony that he did not know why Ferguson was hiring the private investigator, but again, Watson's own testimony in front of the AJ contradicted his earlier statements. *Id.* at 4. The AJ also overlooked that Watson had not been forthright with Shirley by withholding information about his text message with Fay. Thus, in measuring Watson's credibility, the AJ failed to balance factors supporting Watson's credibility with factors giving rise for doubt as to his credibility.

With regard to Ferguson, the Board found no record-based support for the AJ's statement that Officer Ferguson had a motive to spread the culpability of her plan to Watson. *Final Order* at ¶ 18. The Board also found that the AJ had no sound reason to reject as implausible Ferguson's explanation about why she initially sought to exonerate

Watson but later testified under oath that he was indeed involved in execution of her scheme. *Id.* at ¶ 17. As for Fay, the Board faulted the AJ insofar as Fay's testimony was not credible because he could not remember the specifics of events and times. *Id.* at ¶ 20.

Having found sound reasons to fault the AJ's credibility determinations, the Board was free to make its independent assessment of the record, including which of the witnesses to find more truthful than others. The Board particularly disagreed with the AJ's assessment that the text message from Watson to Fay on December 10 was entirely a joke and thus of no consequence to determination of which parties were involved in execution of Ferguson's scheme. Although Fay's response was joking in nature, the Board found the first part of the text to be clear evidence of Watson's involvement in the scheme. The Board also disagreed with the AJ's decision to not count the content of Watson's telephone call to Ferguson as bearing negatively on Watson's credibility. Instead, the Board found that the transcript of the telephone call contradicted Watson's version of the events that he was not involved and that he thought Ferguson had been joking about hiring an investigator. The transcript also corroborated Ferguson's testimony that the scheme was her idea, that she felt bad about getting Watson involved, and that she initially tried to protect him. The Board thus found the AJ's credibility determinations contrary to the weight of the evidence, given the testimony of the two agency witnesses, the December 10 text message, and the transcript of the December 18 telephone call.

On substantial evidence review, we see no error in the Board's determination that sufficiently sound record-based evidence permitted it to reject the AJ's demeanor-based credibility determinations.

B

Watson's argument that the Board failed to consider that the agency used information obtained after the close of the investigation to formulate its decision to terminate him did not identify the information to which he referred. But from review of the full record, we surmise that the information to which he refers is the part of the text message containing Fay's response to Watson's offer in the first part of the December 10 text message. As noted above, it is true that Fay gave the OIG investigators only the first part of the text message thread, and that the full text was given to the agency by Watson in his attorney's response to the agency's proposed removal action. Watson's response to the proposed removal argued that the full text message thread proved that the whole message was a joke and thus was not evidence of Watson's complicity in the scheme.

Watson's argument is misplaced. The Board did not fail to consider the manner in which the text message was divulged. The agency's deciding officials had the full text message and heard Watson's argument that the whole message was merely a joke and not evidence of Watson's participation in the scheme. At the hearing, Watson relied on Fay's responses, arguing that it proved that the whole message was no more than a joke. The AJ agreed with Watson, but the Board, as noted above, correctly disagreed and found the text message proof of Watson's involvement in the scheme. We see no basis for error in the Board's final decision based on the fact that only the first part of the text message was initially given to the OIG by Fay.

C

Watson's argument that the Board failed properly to apply *Giglio v. United States* is also misplaced. *Giglio* covers a fact situation in which the government knows that there is clear reason to fault the credibility of one of its witnesses but fails to disclose that information to a criminal

defendant and allows the case to go to judgment. 405 U.S. at 151-53. That situation results in a violation of due process and the requirement for a new trial. *Id.* at 154-55.

Watson's argument states that *Giglio* should be applied to Ferguson and Fay. But Watson points to no information in the agency's hands that gave the agency clear reason to doubt the credibility of either agency witness. That the AJ made post-hearing determinations that the agency witnesses were not credible does not demonstrate that the agency had clear reason to suspect the truth of its two witnesses before they testified. The Board properly determined that the AJ's assessment of the two witnesses' credibility is incorrect, meaning the agency did not have any information adverse to the agency's witnesses' credibility that would trigger a violation of due process under *Giglio*. Further, *Giglio* related to due process violation in the criminal prosecution setting. Because there is no basis for application of that case to this case, we need not decide if *Giglio* also applies in non-criminal settings.

D

Finally, Watson argues that his due process rights were violated by the failure of the agency to give him a *Miranda* warning before his OIG interview. The AJ and the Board rejected Watson's claim, as do we. In *Miranda v. Arizona*, the Supreme Court required that before any questioning of a persons suspected or accused of committing a crime, "the person must be warned that he has a right to remain silent, that any statement that he does make may be used as evidence against him, and that he has right to the presence of an attorney, either retained or appointed." 384 U.S. 436, 444, 467 (1966). The need for *Miranda* warnings arises in custodial interrogations, *id.* at 444, and one is in custody for *Miranda* purposes when "there is a 'formal arrest or restraint on freedom of movement' of the degree associated with a formal arrest." *California v. Beheler*, 463

U.S. 1121, 1125 (1983) (quoting *Oregon v. Mathiason*, 429 U.S. 492, 495 (1977)).

Nothing in the record indicates that Watson was in custody. The AJ correctly noted that Watson was never arrested, never compelled to answer questions, and was free to leave during his interviews with Booth and the OIG. *Initial Decision* at 19. Further, he was given the *Kalkines* warning before his OIG testimony, which insulated him from criminal prosecution. For these reasons, we agree that Watson fails to show a violation of his due process rights.

### CONCLUSION

For the reasons set forth above, we conclude that the sufficiently sound record-based reasons identified by the Board support its rejection of the AJ's credibility determinations. Consequently, the Board was free to make its own credibility determinations, which support the agency's removal action against Watson. We therefore affirm the final decision of the Board.

### AFFIRMED

### COSTS

No costs.