# United States Court of Appeals for the Federal Circuit

---

**VAUGHN HOEFLIN STANDLEY,**
*Petitioner*

**v.**

**DEPARTMENT OF ENERGY,**
*Respondent*

---

2021-2149

---

Petition for review of the Merit Systems Protection Board in No. DC-1221-20-0788-W-1.

---

Decided: February 16, 2022

---

VAUGHN HOEFLIN STANDLEY, Gainesville, VA, pro se.

ALBERT S. IAROSSI, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, DC, for respondent. Also represented by BRIAN M. BOYNTON, MARTIN F. HOCKEY, JR., FRANKLIN E. WHITE, JR.

---

Before MOORE, *Chief Judge*, PLAGER and O'MALLEY, *Circuit Judges*.

PLAGER, *Circuit Judge.*

Dr. Vaughn H. Standley[1] at the time this case arose was employed by the U.S. Department of Energy (hereinafter "DOE") in its National Nuclear Security Administration. He petitions for review of the Merit Systems Protection Board's ("MSPB" or "Board") decision denying his request for corrective action in an individual right of action appeal.[2] We have jurisdiction pursuant to 28 U.S.C. § 1295(a)(9).

Petitioner alleges that the DOE retaliated against him when he made repeated attempts to correct what he considered a seriously erroneous agency decision related to the mission of providing space-based nuclear detection. Unsuccessful at the agency level and convinced that the agency thereafter retaliated against him for attempting to ensure our continued nuclear detection capability as required by law, Dr. Standley made repeated attempts to get the Merit Systems Protection Board to correct the agency. His attempts failed there as well.

As we shall explain, this case is his latest attempt to get help—including from this court—in his cause. Because the Board again ruled against him, we must decide whether the Board properly denied corrective action on the record presented.

---

[1]     Some of the records in the case refer to Standley as "Mr.," some as "Dr." There are references in the agency email exchanges indicating that Standley was referred to by the agency as "Dr. Standley"—we adopt that as his proper title.

[2]     *Standley v. Dep't of Energy*, No. DC-1221-20-0788-W-1, 2021 WL 2290504 (M.S.P.B. June 1, 2021).

BACKGROUND

By statute, the Secretary of Defense is responsible for our space-based nuclear detection capability. Section 1065 of the National Defense Authorization Act of 2008 provides that "[t]he Secretary of Defense shall maintain the capability for space-based nuclear detection at a level that meets or exceeds the level of capability as of the date of the enactment of this Act."[3]

Although this statutory responsibility was assigned to the Secretary of the Department of Defense ("the Secretary"), the DOE traditionally has assisted the Secretary in this mission. To that end, the DOE provided a system of space-based sensors for nuclear detection, referred to as the Space and Atmospheric Burst Reporting System or SABRS. The Secretary then included SABRS on its Air Force satellites.

While this division of labor sounds straightforward in theory, apparently it has not been straightforward in practice, particularly with respect to funding. This is likely, in no small part, because, while the Secretary bears legal responsibility under § 1065, the statute

> does not prescribe any particular means or technology by which space-based nuclear detection capabilities must be maintained. Rather, it is only violated if detection capability falls below a pre-set standard, and a National Security Council ("NSC") interagency policy committee has the discretion to decide how best to maintain that standard.

*Standley v. Merit Sys. Prot. Bd.*, 715 F. App'x 998, 1002 (Fed. Cir. 2017) (internal citation omitted).

Thus, while the Secretary in the past has relied on the DOE's SABRS program to assist in carrying out its

---

3    Pub. L. No. 110-181, § 1065, 122 Stat. 3, 324 (2008).

mission, § 1065 does not require that the Secretary do so. Similarly, nothing in the statute requires that the DOE continue to provide its SABRS program to the Secretary.

With this background, we turn to the particular facts of this case. This requires a look at a complex of government agency decisional levels, and serious allegations by Dr. Standley spanning several years, amidst a veritable alphabet soup of governmental abbreviations.

At the time of the events at issue, Petitioner Dr. Standley, who appears before us *pro se*, was a General Engineer employed in the DOE's National Nuclear Security Administration ("NNSA"), Office of Defense Nuclear Nonproliferation Research and Development ("DNN"), Office of Nuclear Detonation Detection ("NDD").

The workplace hierarchy involved in the case, in ascending order of rank, was: General Engineer Dr. Vaughn Standley; NDD Director Tom Kiess; DNN Associate Assistant Deputy Administrator Edward Watkins; DNN Assistant Deputy Administrator Rhys Williams; DNN Deputy Administrator Anne Harrington; and NNSA Deputy Administrator Madelyn Creedon.[4] Prior to May 2015, the position of Dr. Standley's immediate superior, the NDD Director, was vacant, so Dr. Standley reported directly to Watkins in his role as DNN Assistant Deputy Administrator.

Dr. Standley worked on the third iteration of the SABRS program—SABRS3. He contends that over several years he sought to ensure that the program was funded and supported, in no small part because Dr. Standley believed this was legally necessary under § 1065. He alleges that,

---

[4]    Watkins replaced Williams as DNN Assistant Deputy Administrator in July 2016. David LaGraffe replaced Watkins as DNN Associate Assistant Deputy Administrator in April 2017.

in contrast, his superiors attempted to block funding of and his work on SABRS3, despite—according to Dr. Standley— also believing that the DOE was legally responsible under § 1065. As noted, these allegations span several years, and involve several layers of officialdom; we recount the most salient facts below.[5]

On August 8, 2014, Dr. Standley emailed Williams, Watkins, and Kiess, indicating that Dr. Standley was studying how to include SABRS3 on an existing Air Force satellite. Williams responded via email:

> We need to talk. I do not, repeat do not, support NNSA being involved in any way, shape or form with a free flier. We provide the payload. Period. If DoD can't get it's [*sic*] act together to support the existing requirement, it's not ours to fix. We hold no requirements. And SABRS3 hosting and data down link is a kluge. I don't want NNSA stuck paying for this for the next 20 years—and we will. I am deciding now whether to stop SABRS3 funding and redirect. I plan to provide a decision brief to NA1/2 in the near future.

Appendix ("A") 3. In response, Dr. Standley agreed that it was a "total kluge," and noted that "[e]ach and every attempt by the community over the last 10 years to get them [the Air Force] to pay or accept funds/direction" had failed. *Id.* He also stated: "Dealing with that has been adhoc/ugly. The whole hosted-payload business is messy. Personally, I feel well equipped to deal with it but someone (you) will decide how much mess we tolerate." *Id.*

Considerably later, during the week of March 26, 2015, Dr. Standley participated in a meeting with Air Force representatives to finalize a joint brief for the House Armed

---

[5]    A more complete account is found in the record before the Board.

Services Committee ("HASC"). Dr. Standley requested that the brief include a statement that § 1065 required U.S. Nuclear Detection System ("USNDS") capability to be maintained in the future. An Air Force representative emailed Williams and Creedon, informing them of Dr. Standley's request, which was approved. Williams forwarded the email to Dr. Standley and others with the note "FYSA," which presumably meant "for your situation awareness."

Later still, in or around July 2015, Williams agreed to a Department of Defense ("DOD") request to suspend executive-level decision meetings of the USNDS Board of Directors, pending further guidance from the National Security Council on how to structure the USNDS. On July 29, 2015, Dr. Standley emailed Williams, asking him to reconsider his decision because it was necessary for the Board to "press a DOD decision to follow-through with funding the necessary ground infrastructure to support SABRS in the long term." A. 5. Williams thanked Dr. Standley for his input and stated he would consider it. Nevertheless, on September 18, 2015, Williams instructed Dr. Standley to cease funding ground segment support related to the USNDS program.

Shortly thereafter, on September 23, 2015, Dr. Standley sent an email entitled "Obstruction of Public law 110-118, NDAA 2008, Maintenance of Space-based Nuclear Detonation Detection System" to Rose Gottemoeller, Under Secretary of State for Arms Control and International Security Affairs. Dr. Standley copied the email to the HASC Chairman, to Harrington, to Department of Defense representatives, and to the U.S. Office of Special Counsel. In the email, Dr. Standley claimed that Williams was obstructing compliance with § 1065.

Harrington forwarded that email to Williams, asking him to "fill in whatever background you have on this." A. 7. Williams responded:

> Dr. Standley raises, what he believes, are serious issues. That said, in no way has DNN R&D or myself obstructed implementation of US Law. In fact, we (NNSA) has [*sic*] increased funding for this important area and have driven the interagency to keep this a priority—to meet US law.

A. 7.

Following several earlier unsuccessful attempts to get the DOE position changed, on August 6, 2020, Dr. Standley filed the instant individual right of action appeal with the Board. He alleged that the DOE and its employees, Williams and Watkins, retaliated against him for his efforts to change the DOE policy by not selecting him for any of three DOE Director positions posted in 2014, 2015, and 2017. Specifically, he alleged that Williams and Watkins *believed* that the DOE was responsible under § 1065, and that Dr. Standley was engaging in protected whistleblowing when he opposed efforts to defund and cease work on the SABRS3 program. Dr. Standley contends that they subsequently retaliated against him for his whistleblowing by not selecting him for any of the three DOE Director positions.

The assigned MSPB administrative judge denied corrective action, finding that Dr. Standley failed to meet his burden of proving that the agency personnel perceived him as a whistleblower. In the absence of a petition for review at the MSPB, the decision became final on July 6, 2021. Dr. Standley timely petitioned for this court's review.

## DISCUSSION

We must affirm the Board's decision unless it is "(1) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; (2) obtained without procedures required by law, rule, or regulation having been followed; or (3) unsupported by substantial evidence." 5 U.S.C. § 7703(c). Substantial evidence "means such relevant

evidence as a reasonable mind might accept as adequate to support a conclusion." *Consol. Edison Co. v. Nat'l Labor Rels. Bd.*, 305 U.S. 197, 229 (1938). "[T]he standard is not what the court would decide in a *de novo* appraisal, but whether the administrative determination is supported by substantial evidence on the record as a whole." *Parker v. U. S. Postal Serv.*, 819 F.2d 1113, 1115 (Fed. Cir. 1987).

On appeal, Dr. Standley contends that the Board failed to consider certain evidence indicating that the DOE, Williams, and Watkins perceived Dr. Standley's activities to be protected, and that the Board also failed to consider certain evidence indicating that the DOE acted fraudulently.

I

First, Dr. Standley argues that the Board failed to consider certain "direct" evidence supporting his position—namely, the September 2015 email from Williams to Harrington and the DOE's annual congressional budgetary requests over several years, which consistently referenced § 1065 in requesting funds.[6]

Dr. Standley contends that this evidence reflects Williams's, Watkins's, and the DOE's perceptions that the DOE was required to continue the SABRS3 program to comply with § 1065. This is not an unreasonable argument, but it is one that the Board expressly considered and rejected in light of the evidence. *See* A. 20 (discussing email), A. 14–15 (discussing yearly budgetary requests).

As the Board explained, the email from Williams to Harrington demonstrated that Williams disagreed with Dr. Standley's views and instead believed that the DOE was continuing to support an important area of law, albeit

---

[6]    Although Dr. Standley contends that the Board failed to consider this evidence, he admits that the Board considered the budgetary requests. *See* Opening Br. at 6.

one that was not the DOE's sole responsibility. In other words, as Williams stated in his email, the issue was one of interagency concern. Similarly, as the Board explained, the statutory references in the budgetary requests did not necessarily equate to a belief that the agency was bound by that statute.

A different fact-finder might have viewed the email and budgetary requests as supporting Dr. Standley's position, but, given the record, because substantial evidence supports the Board's conclusion we cannot reverse or vacate it. "[W]here two different, inconsistent conclusions may reasonably be drawn from the evidence in record, an agency's decision to favor one conclusion over the other is the epitome of a decision that must be sustained upon review for substantial evidence." *In re Jolley*, 308 F.3d 1317, 1329 (Fed. Cir. 2002).

## II

Second, Dr. Standley argues that the Board failed to consider certain "indirect" evidence—for example, Williams's statement about "meet[ing] US law"; Dr. Standley's request to reference § 1065 in the March 2015 HASC briefing; and Dr. Standley's September 2015 email. Dr. Standley contends that, given the "direct" evidence mentioned above, this "indirect" evidence supports his position. But again, the Board expressly considered this evidence and simply reached a different conclusion. *See* A. 19 (concerning Williams's statement about "meet[ing] US law"), A. 19–20 (concerning the HASC briefing), A. 20–21 (concerning the September 2015 email).

As before, substantial evidence supports the Board's conclusion on each point. Williams's statement about meeting U.S. law was made in conjunction with his express belief that it was an interagency concern—not a matter solely for the DOE. Dr. Standley's HASC briefing request was not only unopposed but honored, which made sense given the Department of Defense's involvement in the

briefing and ultimate legal responsibility under § 1065. Similarly, Dr. Standley's September 2015 email certainly demonstrated his own belief that the DOE was legally responsible under § 1065 via SABRS3, but Williams's follow-up response to Harrington indicated a consistent belief that the DOE was not responsible in that manner.

The evidence supports the agency's position that the SABRS3 program was part of the DOE's mission to *assist* the Secretary of Defense. Dr. Standley's suggested alternative conclusion is certainly possible, but it does not detract from the substantial evidence supporting the Board's conclusion. As before, we cannot reverse or vacate on this record given the standard of review.

## III

Third, Dr. Standley contends that the Board failed to cite Watkins's affidavit and therefore failed to consider any of Watkins's sworn statements. Dr. Standley pinpoints Watkins's affidavit statement that "SABRS-3 hosting and gaps were the topic of on-going undersecretary-level Interagency Policy Committee (IPC) meetings." Opening Br. at 14 (quoting A. 32). Dr. Standley believes this statement demonstrates that Watkins and the DOE perceived the SABRS3 program as necessary for § 1065 compliance.

The Board found that Dr. Standley "failed to present preponderant evidence that Watkins perceived him as a whistleblower with respect to the allegations in this appeal." A. 22. While the Board could have viewed Watkins's statement as supporting Dr. Standley's position, the Board also could have viewed Watkins's statement as it did—supporting the DOE's position that SABRS3 was not just an issue for the DOE, but instead had to be sorted out by the Interagency Policy Committee, as Watkins expressly indicated in his affidavit. *See* A. 32. Because the Board's conclusion was supported by substantial evidence, we cannot disturb it.

In a similar vein, Dr. Standley faults the Board for its statement that he "did not put forth particular evidence and argument regarding Watkins' alleged perception of him as a whistleblower with respect to any of the alleged whistleblowing in this appeal." Opening Br. at 7 (quoting A. 22). Dr. Standley asserts that, before the Board, he highlighted Watkins's statement that Dr. Standley's allegedly protected activities were "widely known." Opening Br. at 7.

But Watkins never made this statement, as Dr. Standley admits on the very same page. *See id.* Watkins referred to the "subject of potential gaps"—not Dr. Standley's actions—as "widely known." A. 32. That such gaps existed and were widely known does nothing to prove Dr. Standley's contention as to Watkins's perception of Dr. Standley's actions. Indeed, Watkins had no knowledge of the majority of Dr. Standley's actions. *See* A. 32–33. Further, in his submissions to the Board, Dr. Standley admitted that Watkins's affidavit was largely silent on these points, but Dr. Standley nevertheless contended that Watkins purposely obfuscated the truth.

While Dr. Standley's interpretation of Watkins' statements is possible, the Board's contrary conclusion is again supported by substantial evidence. Substantial evidence supports the finding that Watkins's consistent belief was that the coverage gaps were an interagency issue—not one solely for the DOE. Again, we cannot reverse or vacate on this record given the standard of review.

IV

Fourth and finally, Dr. Standley contends that the Board failed to consider facts indicating that the DOE acted fraudulently by misrepresenting its stance on § 1065 to avoid jurisdiction while simultaneously seeking funding from Congress based on § 1065. Dr. Standley highlights the DOE's annual congressional budgetary requests referencing § 1065, despite the agency's litigation position

before the Board and this court that the DOE bore no legal responsibility under § 1065.

Again, the Board considered this argument and rejected it, finding that the mere mention of the statute in a budgetary request was insufficient to support Dr. Standley's claims. Given the record and Dr. Standley's arguments on appeal, we agree. That the DOE referenced the statute when seeking funds to support the Secretary of Defense's legal obligation does not necessarily mean that the DOE viewed that obligation as its own. Relatedly, since there were no findings of fraud, we cannot endorse Dr. Standley's argument that the Board should have viewed Williams in a less favorable light. As before, the Board's decision was supported by substantial evidence.

SUMMARY

Given the critical importance of the military program at issue, as well as Dr. Standley's well-intentioned beliefs about the mission, and his *pro se* status throughout this extended series of appeals, we have considered his petition in the best light the facts and law allow and in considerable detail. This is the third decision by this court (and the fourth review before the MSPB) arising from the government's decision regarding funding and continuation of DOE's SABRS program.

In the two previous cases before this court, decided by nonprecedential decisions, Dr. Standley presented alternative theories for the reasons he should have been treated as a whistleblower. In this, the third theory, he tried to prove that the deciding officials believed all along that he was right, but ruled against him nevertheless. As in the previous cases, his effort to convert a government policy decision with which he disagreed into the appearance of an intended wrongful use of government property was unavailing.

The Board's decision was supported by substantial evidence and was not arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law, or obtained without procedures required by law, rule, or regulation having been followed. We have considered Dr. Standley's remaining arguments and find them unpersuasive. In sum, we believe that the record shows conclusively that Dr. Standley has had more than his day in court.

## CONCLUSION

For the foregoing reasons, we affirm the Board's decision.

## **AFFIRMED**

### COSTS

No costs.