NOTE: This disposition is nonprecedential.

# United States Court of Appeals for the Federal Circuit

---

**MAYOWA BONOJO,**
*Petitioner*

**v.**

**DEPARTMENT OF HOMELAND SECURITY,**
*Respondent*

---

2025-1050

---

Petition for review of the Merit Systems Protection Board in No. NY-0752-20-0056-I-3.

---

Decided: March 27, 2026

---

HOWARD BRANDON ZAKAI, Granger & Associates LLC, New York, NY, argued for petitioner. Also represented by RAYMOND R. GRANGER.

REBECCA TAYLOR MITCHELL, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, DC, argued for respondent. Also represented by ELIZABETH MARIE HOSFORD, PATRICIA M. MCCARTHY, BRETT SHUMATE.

---

Before MOORE, *Chief Judge*, CHEN, *Circuit Judge*, and KLEEH, *Chief District Judge*.[1]

KLEEH, *Chief District Judge*.

Mayowa Bonojo appeals from a decision of the Merit Systems Protection Board ("the Board"). For the following reasons, we *affirm*.

## BACKGROUND

The Petitioner, Mayowa Bonojo ("Bonojo"), began working for U.S. Immigration and Customs Enforcement ("ICE") in 2009. Appx. 29. He became a Deportation Officer ("DO") in 2016. Appx. 829. On Sunday, February 19, 2017, Bonojo was not scheduled to be on duty but had been advised by a co-worker that he might receive a call requiring him to undertake an assignment at the airport. Appx. 831. Bonojo dressed and placed his loaded government-issued firearm into a holster attached to his belt on the right side of his body, concealed under his shirt. Appx. 831-32.

Bonojo and his wife got into an argument about a text message that his wife had seen on his phone. Appx. 832-33. The argument became physical. Appx. 833. Bonojo asserts that his wife grabbed and held onto him and tried to take his phone from him. *Id.* He claims that he explained to his wife that she needed to stop because he had a loaded firearm on his person, and she was creating a dangerous situation. Appx. 833. Bonojo called the police. Appx. 833-34. He asserts that he separated himself from her and ran to the door, but she ran after him, caught him, and began pulling on his waist to prevent him from escaping the bedroom. Appx. 834. She pulled on the right side

---

[1] Honorable Thomas S. Kleeh, Chief District Judge, United States District Court for the Northern District of West Virginia, sitting by designation.

of his waist, where his firearm was located. Appx. 834-35. Bonojo was scared that the firearm would discharge and knew that his children were in the house. Appx. 835. He then bit his wife on the upper part of her arm, asserting after the fact that he felt there was no other way to escape. Appx. 835.

At that point, Bonojo escaped the bedroom and ran to the living room, but his wife ran after him and began grabbing and hitting him as he tried to open the front door of the house. Appx. 835. Bonojo called the police a second time. Appx. 835. Police arrived and separated Bonojo and his wife. Appx. 836. They took his wife to the kitchen, while Bonojo stayed by the door. Appx. 836. Bonojo's wife told police that Bonojo had thrown her onto the bed, pushed her, and bitten her right shoulder. Appx. 357.

After speaking with Bonojo's wife, the police asked Bonojo if he had bitten her, and Bonojo stated that he did not know. Appx. 837. Bonojo called Supervisory Detention and Deportation Officer Melanie White ("White"), his first-line supervisor at the time, and advised her that there had been a domestic altercation involving him and his wife, that his wife had been acting "crazy," and that police were going to arrest both of them and take them to the station. Appx. 837-39. Bonojo also told White that his wife had bitten her own arm to make it seem as if he had attacked her. Appx. 342. White advised Bonojo that someone would come by to retrieve his credentials. Appx. 838-39.

Police arrested Bonojo and his wife, and Bonojo was charged with simple assault. Appx. 875. While Bonojo was in a holding cell, his second-line supervisor, Assistant Field Office Director Frantz Jeudy ("Jeudy"), arrived to retrieve Bonojo's firearm and credentials and asked to speak to Bonojo. Appx. 840. Bonojo also told Jeudy that his wife had bitten herself. Appx. 214-15.

Bonojo had visible scratch marks. Appx. 203. Although his wife had a visible bite mark, she did not have

any lasting injury and did not require medical attention. Appx. 36. After the incident, Bonojo was placed on light duty and continued to report to work daily. Appx. 842. Approximately three months after the incident, the criminal charges against Bonojo and his wife were dismissed. Appx. 842. In approximately September or October 2017, Bonojo was returned to full duty. Appx. 842-43. Bonojo worked in a full-duty capacity until his removal from his DO position in April 2019. Appx. 843. During this time, Bonojo's supervisors did not complain about his work ethic or integrity, and his performance was outstanding. Appx. 843-44.

In a memo to Jeudy dated February 21, 2017, White indicated that when Bonojo called her to inform her that he had been in an altercation with his wife, Bonojo stated that his wife had been acting "crazy" and that she had bitten herself on her arm "to make it appear he had attacked her." Appx. 358. Bonojo contends that he does not recall telling White that his wife bit herself. Appx. 839-40. On March 21, 2017, White submitted an affidavit to ICE's Office of Professional Responsibility ("OPR") regarding the incident, reiterating the substance of her memorandum. Appx. 341-42.

On August 23, 2018, Bonojo appeared for an investigative interview. Appx. 228. During the interview, Bonojo explained the incident. At this time, when Bonojo was asked whether he bit his wife, he admitted that he did. Appx. 845-46. He explained that because she was pulling and grabbing him, and because he feared that the firearm could inadvertently discharge, he felt that he needed to bite her for her to release him. Appx. 845-46, 233-34. At several points in the interview, investigators asked Bonojo whether he had told his supervisors that his wife had bitten herself, and each time, Bonojo stated that he had not. Appx. 847, 236-39, 250-51. Bonojo denied having a conversation about the bite mark with his supervisors. Appx. 251.

On April 22, 2019, DHS proposed removing Bonojo from federal service. Appx. 93–97. DHS proposed two charges: (1) conduct unbecoming an officer, and (2) lack of candor. Appx. 193. The first charge included one specification:

> Specification 1: On or about February 19, 2017, you bit your wife Monsurat Bonojo on her right upper arm, near her shoulder.

Appx. 193. The second charge included four specifications:

> Specification 1: On or about February 19, 2017, you said in sum and substance to SDDO Melanie White: my wife was acting crazy and she bit her arm to make it seem like I attacked her.

> Specification 2: On or about February 19, 2017, you said in sum and substance to AFOD Frantz Jeudy: my wife started to bite herself.

> Specification 3: On or about August 23, 2018, OPR Special Agent Reuben Vega asked you in sum and substance: did you at any time tell your supervisors that your wife bit herself, and you responded "no."

> Specification 4: On or about August 23, 2018, you said in sum and substance to OPR Special Agent Reuben Vega: I never had any discussion with any supervisor about my wife biting herself.

Appx. 193-94.

On December 11, 2019, Field Office Director Thomas Decker ("Decker") issued the DHS decision to remove Bonojo. Appx. 138-48. Weighing the factors set forth in *Douglas v. Veterans Admin.*, 5 M.S.P.R. 280 (1981), Decker found that Bonojo failed to act with the integrity required of a law enforcement officer who is in "constant contact with the public," noting that he "is always expected to behave in a professional manner." Appx. 153. Although Decker observed that Bonojo had 10 years of service and no

disciplinary record, he determined that these mitigating factors did not outweigh the seriousness of Bonojo's misconduct. Appx. 154. Decker stated that he believed no penalty short of removal would "convey the seriousness of these offenses committed by a federal [law enforcement officer]." Appx. 156. On January 2, 2020, Bonojo timely filed an appeal. Appx. 28. An Administrative Judge held a hearing on March 3, 2021. DHS did not call any witnesses to testify as to what transpired between Bonojo and his wife. White testified that DOs are required to report to their first-line supervisor "any incidents that happen on or off duty which . . . may impede their ability to carry out their mission." Appx. 705. White stated that in reporting an incident, a DO is required to provide "[t]he details of the incident, what occurred, when it happened, and what will . . . happen to them at the time." Appx. 705. She testified that as a first-line supervisor, she is required to report such information to her supervisor and to OPR, noting that OPR investigates any incidents reported by DHS. Appx. 706.

White testified that during her conversation with Bonojo, he stated that his wife had bitten her own arm to make it look as if he had bitten her. Appx. 709-10. Likewise, Jeudy testified that Bonojo told Jeudy that "his wife just went crazy," "[s]he started hurting herself," and "[s]he bit herself." Appx. 809. In describing Bonojo's duties, White testified regarding Bonojo's job duties and stated that he was not required to present criminal cases to the United States Attorney's Office. Appx. 703-04, 799. Jeudy noted that if a detainee would return to the United States unlawfully, a DO would need verify and testify regarding the removal, Appx. 799-800, but DHS did not present any evidence that Bonojo had ever provided such verification or testimony for a criminal prosecution during his career.

White confirmed that when Bonojo was restored to full duty in December 2017, he was under her direct supervision and he was rated outstanding in all activities. Appx.

718-20. Likewise, Decker testified that the incident had no impact upon Bonojo's performance of his duties until the charges were sustained, that Bonojo had outstanding performance after he was restored to duty, and that there had been no complaints about his performance. Appx. 766–67.

On March 31, 2021, the Administrative Judge issued an Initial Decision sustaining DHS's charges and mitigating the penalty to reassignment to a non-law-enforcement-officer position. Appx. 37. In sustaining the first charge, conduct unbecoming a law enforcement officer, the Administrative Judge observed that it was "undisputed" that Bonojo bit his wife's arm. Appx. 32. In response to Bonojo's argument that he had acted in self-defense, the Administrative Judge noted that Bonojo admitted that biting was not a defensive tactic taught to law enforcement officers. Appx. 32. The Administrative Judge wrote, "I find that even if one accepts . . . [Bonojo's] version of what took place, biting was not a reasonable tactic and that, as a trained law enforcement officer, he could have used other means to deescalate the situation." Appx. 32.

With regard to the second charge, lack of candor, for Specifications 1 and 2, the Administrative Judge found that White's and Jeudy's statements were more credible than Bonojo's denials. Appx. 33-35. The Administrative Judge observed that neither supervisor was conducting an investigation but noted that Bonojo was "obligated to be truthful in his statements[.]" Appx. 34-35. The Administrative Judge sustained Specifications 1 and 2. Appx. 34-35. With regard to Specifications 3 and 4, which relate to information Bonojo provided to OPR during his interview on August 23, 2018, the Administrative Judge merged them into a single specification. Appx. 35. She found that Bonojo's testimony was not credible and sustained the merged specification. Appx. 35.

When assessing the reasonableness of the penalty, the Administrative Judge determined that Decker had not

adequately considered the fact that Bonojo's wife was not seriously injured and that Decker had not attributed adequate weight to Bonojo's overall performance. Appx. 36-37. She noted that Bonojo was given an overall rating of outstanding for the period of October 1, 2018, to September 30, 2019, and for the following rating period. Appx. 36-37. The Administrative Judge further noted that at the time of the removal, Bonojo had more than 10.5 years of federal civilian service and did not have a prior disciplinary record. Appx. 37. The Administrative Judge observed Decker's view that "if it was necessary for the appellant to testify, his testimony could be impeached," as well as Decker's failure to consider imposing a penalty short of removal. Appx. 37. The Administrative Judge found that the maximum reasonable penalty was placement in a non-law-enforcement position, thus mitigating the penalty. Appx. 37. Bonojo petitioned for review of the Initial Decision. Appx. 1. On August 22, 2024, the Board issued a Final Order denying his petition and summarily affirming the Initial Decision. Appx. 1-5. On October 7, 2024, Bonojo timely filed a petition for review of the Board's Final Order. We have jurisdiction under 28 U.S.C. § 1295(a)(9).

## DISCUSSION

We set aside a decision of the Board only if it is "(1) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; (2) obtained without procedures required by law, rule, or regulation having been followed; or (3) unsupported by substantial evidence[.]"  5 U.S.C. § 7703(c). Substantial evidence "means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Standley v. Dep't of Energy*, 26 F.4th 937, 942 (Fed. Cir. 2022) (citation omitted). "[T]he standard is not what the court would decide in a *de novo* appraisal, but whether the administrative determination is supported by substantial evidence on the record as a whole." *Id.* (citation omitted). "[T]he substantiality of evidence must take into account whatever in the record fairly

detracts from its weight." *McGuffin v. SSA*, 942 F.3d 1099, 1107 (Fed. Cir. 2019) (citation omitted). The Court may not "substitute [its] judgment for that of the [B]oard as to the weight of the evidence or the inferences to be drawn therefrom." *Cross v. Dep't of Transp.*, 127 F.3d 1443, 1448 (Fed. Cir. 1997) (citation omitted).

Bonojo seeks vacatur of the Board's Final Order for three reasons. First, with respect to the charge for conduct unbecoming an officer, Bonojo argues that the Board abused its discretion and otherwise erred as a matter of law in failing to assess whether Bonojo's use of force was reasonably necessary to prevent serious harm to himself, his wife, his children, and others in the house. Second, Bonojo argues that the disciplinary action against him for lack of candor violated his rights to due process and his privilege against self-incrimination. Third, Bonojo argues that in assessing the penalty, the Board erred in relying upon DHS's concerns of a *Giglio* impairment without analyzing the actual impact of that impairment on Bonojo's day-to-day duties, including whether Bonojo actually testifies. For the reasons discussed below, the Court affirms the Board's Final Order.

## I.

With respect to the first charge, Bonojo argues that the Board abused its discretion and otherwise erred as a matter of law in failing to assess whether Bonojo's use of force was reasonably necessary to prevent serious harm to himself, his wife, his children, and others in the house. Specifically, he alleges that the Board failed to assess the requisite factors under *Fuller v. Dep't of Navy*, 94-3190, 40 F.3d 1250, 1994 WL 585732 (Fed. Cir. Oct. 26, 1994) (unpublished).

"A person is entitled to defend [him]self when it would appear to a reasonable person under similar circumstances that []he is in immediate danger of bodily harm." *Fuller*, 1994 WL 585732, at *2. "However, []he is justified in using

only such force as appears to be reasonably necessary to resist the unlawful attack." *Id.* Regardless of the burden of proof, "[f]actors to consider in determining whether the level of force was reasonably necessary include the amount of force exerted, the means or instrument used, the manner or method of applying the force, and the circumstances under which the force was applied." *Id.* (citation omitted).

Bonojo argues that neither the Initial Decision nor the Final Order explicitly references self-defense, cites the *Fuller* standard, or assesses what a reasonable person would have done under the circumstances to neutralize the risk presented to Bonojo. The Board did not explicitly acknowledge Bonojo's hearing testimony about how his wife's erratic behavior and relentless pulling on his belt (which held the firearm) risked causing the firearm to dislodge and discharge. The Administrative Judge did not explicitly acknowledge Bonojo's testimony that he resorted to biting to free himself and to prevent serious harm only after a series of escalating events.

Finally, Bonojo argues that the Administrative Judge, in finding that "biting was not a reasonable tactic and that, as a trained law enforcement officer, [Bonojo] could have used other means to deescalate the situation," did not explain why she believed that biting was not reasonable under the circumstances and did not suggest what "other means" Bonojo could have used to deescalate the situation. In its Final Decision, the Board found that it was "reasonable to expect that . . . [Bonojo] not resort to such violence" and that Bonojo's actions "cast[ed] doubt upon his ability to perform his duties[.]" Appx. 4. Bonojo argues that the Administrative Judge made a *per se* finding that one must use a "taught defensive tactic" in order to be found to have engaged in self-defense. DHS argues that the Administrative Judge's decision accounts for Bonojo's claim of self-defense because the Administrative Judge sustained the charge "even if one accepts [Bonojo's] version of what took place[.]"

We conclude that the Administrative Judge properly considered the issue of self-defense. The Administrative Judge found that Bonojo's behavior was unreasonable "even if one accepts Bonojo's version of what took place," which assumes that she considered his self-defense argument. Although the Administrative Judge did not explicitly reference the *Fuller* factors, she considered them in substance: the reasonableness of the force employed by Bonojo, the amount of force he used, the means or instrument used, the manner or method of applying the force, and the circumstances under which the force was applied. The Administrative Judge effectively determined that Bonojo's action was not self-defense because it was not reasonably necessary to resist immediate danger of bodily harm. *See Fuller*, 1994 WL 585732, at *2.

We also reject Bonojo's contention that the Administrative Judge made a *per se* finding that using a "taught defensive tactic" is required in order to show self-defense. Specifically, the Administrative Judge wrote,

> At the Board hearing, the appellant testified that his wife acted "crazy" in her attempts to get the phone away from him. He testified that she would not listen when he told her that the firearm was loaded and that she had to stop. . . . Nevertheless, he acknowledged that biting is <u>not</u> taught as a defensive tactic for law enforcement officers.
>
> I find that even if one accepts the appellant's version of what took place, biting was not a reasonable tactic and that, as a trained law enforcement officer, he could have used other means to deescalate the situation.

Appx. 32. The Administrative Judge merely noted that biting was a not a taught defensive tactic as part of her overall determination that Bonojo's behavior was not reasonable. She did not create a *per se* rule with respect to taught defensive tactics. Bonojo has not met his burden to show that

we should hold unlawful or set aside the Board's decision. The Board's Final Order is affirmed with respect to the charge of conduct unbecoming of an officer.

## II.

Bonojo argues that the disciplinary action against him for the second charge, lack of candor, violated his rights to due process and his privilege against self-incrimination because he was never given warnings pursuant to *Kalkines v. United States*, 473 F.2d 1391 (Ct. Cl. 1973), and *Garrity v. New Jersey*, 385 U.S. 493 (1967).  DHS argues that Bonojo failed to raise a Fifth Amendment challenge before the Board.  Bonojo points out that he repeatedly raised the significance of not being provided notice that his discussions with supervisors could be relied upon for purposes of discipline or were protective from self-incrimination.

For us to review an argument, the argument must first be presented to the Board.  *Sistek v. Dep't of Veterans Affs.*, 955 F.3d 948, 953 n.1 (Fed. Cir. 2020) (citation omitted). Specifically, below, Bonojo argued in a closing memorandum dated March 8, 2021, that "[n]either SDDO White nor AFOD Jeudy put [him] on notice that their conversations were investigatory as opposed to a personal welfare check in the midst of the 'heat of the moment.'"  Appx. 692.  He did so, however, for the purpose of arguing that his statements were not "material" and could not support a lack of candor charge.  Appx. 686-93.  During the evidentiary hearing before the Administrative Judge, Bonojo's counsel asked White and Bonojo whether *Kalkines* warnings were provided, but he did so for the purpose of showing that Bonojo's conversations with his supervisors were informal. Appx. 722-23, 841-42.  In a petition for review dated May 4, 2021, Bonojo pointed out that no "Weingarten" rights were provided and the "risk of discipline" to him was never made known, but, again, he asserted this for the purpose

of arguing that the discussions were informal, non-investigatory, and immaterial.  Appx. 901-908.

It is undisputed that Bonojo did not explicitly mention the Fifth Amendment before the Board.  While Bonojo did mention notice, he did not do so for the purpose of raising a Fifth Amendment challenge.  He never made a Fifth Amendment challenge before the Board.  Rather, Bonojo raised the issue of notice to argue that the setting was informal and that his statements were not material.  Accordingly, the Court finds that Bonojo's Fifth Amendment challenge with respect to the lack of candor charge has been waived, and the Board's Final Order is affirmed with respect to the charge.

## III.

Finally, Bonojo argues that in assessing the penalty, the Board erred in relying upon DHS's concerns of a *Giglio* impairment without analyzing the actual impact of that impairment on Bonojo's day-to-day duties, including whether Bonojo actually testifies. The reasonableness of a penalty is determined by reference to the *Douglas* factors. *Holmes v. USPS*, 987 F.3d 1042, 1047 (Fed. Cir. 2021) (citing *Douglas*, 5 M.S.P.R. at 280).  If the Board finds DHS's penalty to be excessive, it may mitigate the penalty.  *See* 5 U.S.C. § 7701; *Lachance v. Devall*, 178 F.3d 1246, 1260 (Fed. Cir. 1999).  This Court reviews a penalty determination to ascertain "whether the penalty is clearly excessive or an abuse of discretion." *Coleman v. U.S. Secret Serv.*, 749 F.2d 726, 729 (Fed. Cir. 1984) (citation omitted).  In its review, the Court must "defer to the [Board's] choice of penalty unless the penalty exceeds the range of permissible punishment specificized by statute or regulation, or unless the penalty is so harsh and unconscionably disproportionate to the offen[s]e that it amounts to an abuse of discretion." *Tartaglia v. Dep't of Veterans Affs.*, 858 F.3d 1405, 1408 (Fed. Cir. 2017) (citation and internal punctuation omitted).

Here, to contest the mitigated penalty, Bonojo argues that the Board erred in relying on DHS's stated concerns that Bonojo is *Giglio*-impaired[2] without analyzing the actual impact of that impairment on Bonojo's day-to-day duties. He argues that there is no evidence that any Giglio impairment impacts or is otherwise relevant to Bonojo's actual duties. Bonojo is not required to present criminal cases to the United States Attorney's Office or otherwise directly work on criminal prosecutions, and he does not regularly testify in court. DHS did not present any testimony or other evidence that Bonojo has ever testified.

Bonojo argues that the Board's error is compounded by the fact that DHS has retained law-enforcement officers in federal service despite their becoming potentially *Giglio*-impaired due to charges involving lack of candor and other acts of dishonesty, including far more egregious circumstances than are at issue here. Bonojo also argues that other law enforcement agencies operate under the premise that their officers who could be *Giglio*-impaired can, in fact, be rehabilitated and continue to work as law-enforcement officers. Overall, Bonojo argues that DHS's professed concerns here are conclusory and overstated.

DHS first argues that the Board's mitigated penalty is reasonable and that any further mitigation would be unreasonable, given the seriousness of Bonojo's misconduct in biting his wife. It argues that reassignment to a non-law enforcement position is a reasonable penalty for an employee who committed conduct unbecoming an officer. Second, DHS argues that Bonojo has misread the Administrative Judge's opinion. Although DHS, in removing Bonojo, relied on the fact that Bonojo could be *Giglio*-

---

[2]    Pursuant to *Giglio v. United States,* a law enforcement officer called to testify in a criminal proceeding must disclose prior misconduct that is probative of truthfulness. 405 U.S. 150, 154 (1972).

impaired if called to testify, the Administrative Judge merely listed DHS's concerns regarding *Giglio*-impairment among her considerations when mitigating the penalty. Appx. 37. The Administrative Judge observed that Decker had "expressed the view" that Bonojo's testimony could be impeached and that the deciding official had not considered a penalty short of removal. Appx. 37. The Administrative Judge then disagreed with the deciding official and imposed a lesser penalty. Thus, DHS argues, the Administrative Judge did not adopt DHS's *Giglio*-based rationale. Finally, to the extent that Bonojo tries to draw comparisons to other law enforcement officers who were potentially *Giglio*-impaired, DHS argues that Bonojo forfeited the ability to make comparator arguments because he did not raise them below. Regardless, DHS argues that Bonojo conflates penalties imposed by DHS with penalties imposed by the Board.

The Court agrees with DHS that Bonojo has misread the Administrative Judge's decision. The record indicates that the Board weighed the relevant factors. The Administrative Judge summarized Decker's findings regarding *Giglio*-impairment and was not relying on *Giglio*-impairment as a justification for any enhanced sentence. Of course, the Administrative Judge actually disagreed with DHS's assessment and reduced the sentence. Overall, the penalty imposed is not clearly excessive or an abuse of discretion. Accordingly, the penalty is *affirmed*.

### CONCLUSION

We have considered Bonojo's remaining arguments and find them unpersuasive. For the foregoing reasons, we *affirm*.

### **AFFIRMED**